UNITED STATES, Appellee

v

RONALD N. McFERREN, Private E-1, U. S. Army, Appellant

6 USCMA 486, 20 CMR 202

No. 6818

Decided November 10, 1955

*Captain Albert C. Malone, Jr.*, argued the cause for Appellant, Accused. With him on the brief was *Lieutenant Colonel Jackson K. Judy.*

*First Lieutenant Edward S. Nelson* argued the cause for Appellee, United States. With him on the brief was *Lieutenant Colonel Thomas J. Newton.*

### Opinion of the Court

GEORGE W. LATIMER, Judge:

### I

The accused in this case was tried by general court-martial and found guilty of six specifications of larceny by check, in violation of the Uniform Code of Military Justice, Article 121, 50 USC § 715. He was sentenced to a bad-conduct discharge, total forfeitures of all pay and allowances, and confinement for 18 months. The findings and sentence were approved by the convening authority and later affirmed by a board of review in the office of The Judge Advocate General of the Army. We granted accused's petition for review but limited consideration to one issue, namely: Whether the law officer erred to the prejudice of the accused by curtailing defense counsel in his cross-examination of a handwriting expert.

The issue arose in the following manner. The prosecution established that in October 1954, six checks bearing the name of the accused as maker were cashed at various post exchanges on Okinawa and that the bank on which the checks were drawn had no account in his name. Six known exemplars of accused's signature were then introduced in evidence. An expert witness who identified himself as Chief Document Examiner, United States Army, Far East Criminal Investigation Laboratory, testified that he had compared the known signature with those appearing on the checks in issue and in his opinion they were all written by the same person.

On cross-examination, defense counsel handed the expert witness several pieces of paper. On each the name Ronald N. McFerren had been written. It was stated by defense counsel that one or more of the signatures had been affixed by the accused, and the papers were offered in evidence. It was explained by defense counsel that the offer was made preliminary to having the witness identify those signatures on the slips which he determined were written by the accused. In anticipation of a claim of surprise or unfairness, defense counsel suggested a continuance to give the witness ample time to make a thorough comparison with other signatures. Trial counsel objected to the reception of the exhibits and the requested continuance. In opposition to the admission, he asserted that the defense must submit samples of a known person's handwriting if he desired to test the fallibility of the expert. His objection to the continuance was based on a contention that the procedure being adopted by defense counsel was purposeless. The law officer rejected the exhibits and refused the continuance without comment, apparently accepting trial counsel's contention that samples of the handwriting of unidentified persons are inadmissible and not useable for the purpose intended.

### II

The scope of cross-examination of a handwriting expert has not as yet been delineated by this Court, and the novelty of the issue has caused us to look to all of the authorities. An inspection of those precedents reveals a distinct lack of unanimity. One line of authority, mostly early decisions, adheres to the rule that cross-examination is restricted within narrow limits. The restriction is imposed, in part, because those authorities reason that specimens to be useable must be conceded or proved to be genuine, or they must have some relationship relevant to the cause other than their use to test the expert. Apparently the same principle is applied on both direct and cross-examination. Illustrations of this rule may be found in United States v Cham-

488

berlain, 25 Fed Cas No. 14,778 (CC D NY 1874), where it was held:

> " . . . [It is] incompetent to test the knowledge of an expert in handwriting, by placing before him irrelevant papers, for the mere purpose of contradicting his testimony as to the handwriting thereof."

and also in People v Parker, 67 Mich 222, 34 NW 720 (1887) where the court stated:

> " . . . Comparisons of this kind can only be made with such writings as are legally in evidence for some other purpose than that of being compared."

It will be observed that the previously quoted authorities do not state one of the great and common objections which has caused courts to look with disfavor on the use of unproven signatures for comparison purposes. Stated briefly, it may be identified as the principle of confusion of issues, and it is bottomed on the belief that by permitting the admission of unidentified writings for the purpose of testing the expert witness, time would be consumed needlessly and confusion would result from the collateral issues injected into the cause. Thus in Gaunt v Harkness, 53 Kan 405, 36 Pac 739, 741 (1894), cited with approval in State v Maxwell, 151 Kan 951, 102 P2d 109 (1940), it was said:

> " . . . 'The rule which excludes extrinsic papers and signatures is substantially the same in the direct and cross-examination, as will be seen from the foregoing authorities. Papers not a part of the case, and not relevant, as evidence, to the other issues, are excluded mainly on the ground that to admit such documents would lead to an indefinite number of collateral issues, and would operate as a surprise upon the other party, who would not know what documents were to be produced, and hence could not be prepared to meet them.' "

The opposing view affords a broader scope of cross-examination by permitting the cross-examiner to introduce unidentified writings prepared for the particular purpose of testing the opinion of the witness. In Browning v Gosnell, 91 Iowa 448, 59 NW 340, 343 (1894), quoted with approval in Adams v Ristine, 138 Va 273, 122 SE 126 (1924), the expert was given several signatures to test his skill. Some of the exemplars were genuine, and some had been written by other undisclosed persons. The court said:

> " . . . We think it is proper, when a witness testifies to the genuineness of a handwriting or signature, to test the value of his evidence thoroughly, and for that purpose he may be asked to give his opinion as to the genuineness of signatures which are prepared for that purpose, and in the handwriting of any person. Opinions as to the genuineness of handwriting are, at best, weak and unsatisfactory evidence, and every reasonable opportunity should be afforded, on cross-examination, to test the value of the opinion of the witness, and we know of no better way than was resorted to in this case."

A similar holding was announced in Travelers' Ins. Co. v Sheppard, 85 Ga 751, 12 SE 18, 20 (1890). There the court in its syllabus stated the rule in the following language:

> "Witnesses who have testified as experts in handwriting may be cross-examined in any appropriate way, to test their skill. Writings and parts of writings, no matter by whom written, may be exhibited to them for their opinion as to the identity of the handwriting with that in question, and neither the witness nor the opposite counsel is entitled to know what writings will be used for this purpose, or whether they are genuine or not, or by whom they were written."

The two lines of authorities seem to support generally the two distinct modes of testing witnesses referred to by Dean Wigmore in his work on Evidence, 3d ed, § 2015. He states his views as follows:

> "The general principle involved is that of *testing a witness' qualifications* by *specific instances* (*ante*, § 991), as well as that of *forbidding*

*contradiction on a collateral matter* (*ante,* § 1005). The application of those general principles to testimony to handwriting may be now considered. With reference to the mode to be used, there are two distinct modes of testing by showing specimens on cross-examination: (1) where it can be done *without special proof of the genuineness* of the testing specimens; (2) where it can be done only *with special* proof of that."

The first mode finds its support in those jurisdictions which permit only a limited scope of cross-examination while the second method would, in all probability, be allowed in courts which permit greater latitude to the cross-examiner. For reasons which are peculiar to the military judicial system, and because we are free to chart a new course in this field of evidence, we prefer to follow the more liberal rule. While its adoption may present military courts-martial with certain well-recognized obstacles, they are inconsequential when weighed against the damages which might be foisted on an accused were we to adopt the strict principle. Certain it is that if we permit the use of unidentified signatures for testing purposes, an additional element may be introduced into the case. But there would be little, if any, value to the cross-examination if the defense is precluded from proving the genuineness or lack of genuineness of the testing exemplars, and thereby contradicting the expert. Dean Wigmore comments on the difficulties to be encountered if a wide scope of cross-examination is permitted, but he goes on to offer cogent reasons as to why that means is the better. We quote from § 2015 (2) of his work:

". . . Now this necessity of specially producing testimony as to the specimens' genuineness brings into play the whole argument of multiplicity of issues as otherwise applicable against the ordinary use of specimens (*ante,* § 2000). There is perhaps also a certain possibility of surprise and of unfairness of selection (*ante,* § 1999).

"There are thus two solutions possible. The *first* is to accept as valid these arguments of surprise, of danger of unfair selection, and of confusion of issues, and to follow, in obviating them, the limitations already adopted, in the jurisdiction in hand, for the ordinary use of specimens (*ante,* § 2008), *i.e.* to limit the use to specimens admitted genuine, to specimens already in the case, or the like. The *second* is to deny that these arguments, whatever their force as applied to the ordinary use of specimens, can here avail to cut off this method of testing opinions on cross-examination.

"That the latter is the better course seems clear. The reason is that the deprivation of this weapon for the cross-examiner is a loss so serious as to outweigh the inconveniences of its sanction. When, for example, the witness has sworn positively that the disputed signature is genuine, and then, on examining a new signature submitted to him, he declares with equal positiveness that it is a forgery and perhaps points out the (to him) unmistakable marks of difference, the testimony of a single unimpeachable witness that he saw the supposed forgery written by the person bearing that name disposes at once of the trustworthiness of the first witness and the certainty of his conclusion. In many other similar ways a single test of this sort will serve to demolish the most solid fabric of handwriting-testimony. There should be no limitations whatever on the power of employing these tests."

In adopting the more liberal rule, we have been influenced by our belief that the possible introduction of a collateral issue is not of sufficient importance to cut off the right of an accused to subject a handwriting expert to extensive cross-examination on his conclusions. We have had occasion to express our views on the importance of the right of cross-examination, and we turn to United States v Hernandez, 4 USCMA 465, 16 CMR 39, for our pronouncement. There we stated:

". . . The determination of the

proper limits of cross-examination is within the sound discretion of the law officer, but we think it appropriate to point out that counsel should be accorded considerable latitude in such examination. The right of cross-examination is a fundamental right and an invaluable means for determination of the truth; it should not be unnecessarily curtailed."

We have no desire to retreat from that position, and so we look to the facts of this case to determine whether the law officer abused his discretion in denying defense counsel the right to test the witness. There were six separate specifications in which the accused was charged with larceny by check. In five instances, the strength of the Government's case depended principally on the testimony of the handwriting expert. He alone identified the accused as the person who signed the various checks, and his testimony, standing by itself, was adequate to fix criminal responsibility on the accused. It should, therefore, be evident that only by casting doubt on the opinion expressed by him could accused hope to defend successfully.

While this case must be resolved on its particular facts, it is of importance in formulating the necessary principles not to overlook the peculiar situation of the military serviceman. In many instances, accused persons in the military service are in foreign lands and the possibilities of obtaining expert witnesses to assist them in their defense is considerably restricted. Here, the Government found it necessary to transport a handwriting expert from Japan to Okinawa to establish its case against the accused. Apparently no other person qualified in this field was available at the place of trial, and it would be difficult indeed for the accused to obtain the services of an expert. While we have not been confronted with many handwriting cases in which expert witnesses have been used, the possibilities of their use is ever present, and the limitations facing an accused in the service make it necessary that he be given consideration not necessarily granted to persons tried in local courts. Certainly, in considering whether a law officer abused his discretion, we must consider the handicaps placed upon an accused person in presenting his side of the controversy. Ordinarily there are two ways in which he can weaken or rebut the testimony of an expert.

The first method is by producing contrary testimony from another expert. The second means is by undermining the qualifications of the witness. The first may be unavailable to an accused—here it was—and this makes it more important that the second be unabridged. Under service conditions, and when the guilt or innocence of an accused can depend largely upon the conclusion of an expert, a liberal application of the rules of cross-examination appears in order.

In adopting the more liberal rule, we realize fully that there is much merit to the contention that in so doing we may possibly allow collateral matters to detract from or becloud the real issues. We, however, feel the end result is worth the price exacted, particularly when the qualifications of the expert ought to permit little dispute about the true signature. If he truly is qualified in this field, and is allowed sufficient time for a thorough examination, he will not be led astray by the gambit offered by this defense counsel. Moreover, the deprivation of the right to cross-examine an expert by the use of unidentified exemplars is a loss of such proportions that the dangers of confusion and unfairness resulting from the injection into a case of a collateral issue is relatively unimportant. At least, they are not of sufficient moment to cause us to deprive the accused of one of his most valuable weapons of defense.

III

Some contention is advanced that defense counsel is placed in a preferred position where he has the alternative of proving the true signatures if the expert fails in his identification, or of remaining silent if the witness identifies properly the true specimens of accused's handwriting. That objection is hardly a ground which touches on admissibili-

ty. Every party, if he has any choice, produces favorable evidence and avoids that which is unfavorable. The opposing party has the privilege of bringing in that portion of the testimony which is beneficial to him. Furthermore, a failure on the part of defense counsel to dispute the accuracy of the expert's identification of the test exemplars would no doubt be detrimental to his client's case. Assuming that any alleged preference cannot be removed entirely, it appears to us that the fate of the accused may, in many instances, depend upon a single test of the sort attempted to be used here. That method alone may be the only way in which to demolish the erroneous conclusions of a witness, and the accused should not be denied that means because of the possibility of some slight disadvantage to the Government.

## IV

It is claimed by counsel for the Government that recent advancement in chirography renders this ▮▮▮▮ type of cross-examination of little value. This argument stems from a belief that courts can now proceed without fear of any injustice being done because handwriting experts seldom, if ever, err in their identifications. We have no reason to dispute the contention that the skills in this field have narrowed the possibility of error, but we are not impressed with the argument that the experts are infallible. Experts in the military service sometimes operate under conditions which are not ideal and only recently we decided a case where an incorrect identification of handwriting raised an imputation of fraud against an officer. See United States v DeLeo, 5 USCMA 148, 17 CMR 148. Furthermore, it appears to us that if the skills have improved, there is less danger of surprise or unfairness in this type of cross-examination. Better techniques ought to narrow the limits of error, and the expert witness, if given sufficient time to study and compare the exemplars, should be better able to select the signature of an accused from those of third parties.

## V

Lastly, Government counsel press on us the argument that assuming error, this case is governed by ▮▮▮▮ the harmless error rule. We conclude otherwise. Had the cross-examination been permitted and the qualifications of the expert undermined thereby, the court-martial members could reasonably have found the accused not guilty. His fate depended to a large extent upon the court-martial accepting or rejecting the conclusions of the one expert witness. To restrict the attack upon him without warrant was to deny the accused a substantial right and prejudice is apparent.

The decision of the board of review is reversed. The record is returned to. The Judge Advocate General of the Army. A rehearing may be ordered.

Chief Judge QUINN and Judge BROS-MAN concur.