UNITED STATES, Appellant and Cross-Appellee

v.

AUGUSTO HERNANDEZ, Corporal, U. S. Army, Appellee and Cross-Appellant

4 USCMA 465, 16 CMR 39

No. 4105

Decided July 2, 1954

Lt Col William R. Ward, U. S. Army, 1st Lt Roderick V. Brown, U. S. Army, 1st Lt William G. Fowler, U. S. Army, and 1st Lt Martin Blackman, U. S. Army, for Appellant and Cross-Appellee.

Major Edwin Doran, U. S. Army, and 1st Lt Justin L. Vigdor, U. S. Army, for Appellee and Cross-Appellant.

## Opinion of the Court

Robert E. Quinn, Chief Judge:

A board of review reversed the accused's conviction for rape because of error in the admission of a pretrial statement by the accused. The Judge Advocate General of the Army has asked this Court to review the legal correctness of the board's decision. In addition, we granted the accused's petition for review to consider a number of issues raised by him.

On April 17, 1953, Miss Marga Forster, the complaining witness, was at the Bahnhof Cafe, Kirchheimbolanden, Germany, in the company of a Mr. Anton Krivda, the accused, and another girl. Miss Forster had been at the Alte Post restaurant earlier that evening. She was supposed to be home by 10:00 p.m., but instead she left the restaurant with the others, at about 9:30 p.m., and accompanied them to the cafe. At both places, she drank beer and cognac. "Shortly before one o'clock" she left the cafe. According to her testimony, she departed alone. The accused followed her. When she had walked a short distance from the cafe, the accused "grabbed . . . and pulled" her into an intersecting street. She fell to the ground and "bumped . . . [her] head against a stone . . . and so . . . was half unconscious"; the accused "started heaving and panting" and she "became afraid." Over her physical and verbal protests, the accused ultimately effected carnal connection with her. After the act, she pulled herself free and made her way to her home; the accused continued to follow her.

Although there were houses in the immediate area, and along the way, Miss Forster made no outcry during the incident, or while she walked to her house. She gave as her reason that she "said to myself, 'Well, it can't be helped now, and if I scream, people know about it, and rumors catching around would be that I was a whore.'" On reaching the front gate of her house, the accused again grabbed and kissed her. She did not scream or make any outcry. On entering her house, she found her father and mother awake and waiting for her. Earlier, her father had notified the police that she was missing. On questioning by her parents as to where she had been and what had happened, her only response was, "I don't know."

466

After repeated questioning, she referred to the connection with the accused, without, however, mentioning the use of any force. Certain personal measures were taken for her protection, but she still "hadn't told her [mother] yet at all how exactly it was." She then "just fell into . . . bed and fell asleep."

Other prosecution evidence tending to corroborate the charge came from Miss Forster's mother and two civilian doctors. However, most important is the contested pretrial statement by the accused, in which he admitted that he assaulted Miss Forster and had "sexual intercourse with her against her will."

The accused is of Puerto Rican descent. He has served almost 13 years in the Army. However, except for about the last six months, his service was exclusively with Puerto Rican troops. He speaks Spanish. At the trial, he testified through an interpreter. He contradicted Miss Forster in all important respects. He said that during the evening she acted "very friendly" toward him. About midnight, Miss Forster decided to go home. She asked him to help her with her coat, and they left the cafe, "arm in arm." En route to Miss Forster's house, they kissed a number of times. The kissing led to a discussion regarding a more intimate association, and eventually they "had it." Thereafter, the accused accompanied Miss Forster to her home. At the gate, they kissed again, and she asked the accused to meet her at the restaurant on a future date. The accused then returned to the Bahnhof Cafe. He rejoined Krivda and told him that Miss Forster "was good."

Krivda corroborated the accused. He said that the accused helped Miss Forster with her coat, and they left the cafe together. On the accused's return, he appeared "quite normal" and "he was glad." The accused told him he was going to meet Miss Forster again, and that he "had had something with her." The accused had a little kiss mark on the side of his face.

In view of the sharp conflict in the testimony on the main issue, it is apparent that the accused's pretrial con-fession is of considerable importance. See: United States v. Monge, 1 USCMA 95, 2 CMR 1. Defense counsel strenuously objected to its admission in evidence. Substantial testimony was introduced on that issue.

Sergeant L. E. Campbell, a Criminal Investigation Division Investigator, testified that on April 18, 1953, he interviewed the accused in the presence of Captain Hans Tauber, the accused's commanding officer, in the latter's office. He spoke with the accused in English. He informed the accused that he was being investigated for rape and he warned him of his rights under Article 31, Uniform Code of Military Justice, 50 USC § 602. The accused seemed "more or less" surprised; first "he said he didn't understand; then he said he did, and that he thought the girl was making a false accusation against him." At the outset, Sergeant Campbell thought the accused had difficulty in understanding him, but after three or four minutes he believed the accused "understood . . . [him] fully." No statement was obtained from the accused at that time. On April 21, 1953, Sergeant Campbell again interrogated the accused. This interrogation took place at the Criminal Investigation Division office. He "read and explained the 31st Article" to the accused. The accused then made an oral statement, which was reduced to writing by Sergeant Campbell. The agent used his "own wording," but he did not change the substance of the accused's oral statement. The writing was read back to the accused and typed; it was then read and signed by the accused.

Captain Tauber testified for the defense. He said that, in his presence, Sergeant Campbell made no mention of Article 31. However, he did inform the accused that he was being investigated for rape. The accused seemed "surprised or shocked." The accused had difficulty in understanding, and the agent was required to repeat himself on "several occasions." Captain Jack Wolpert, a dental officer, also testified for the accused. He knew the accused personally. He described the accused as eager "to do what you ask of him and please his superiors. If he thinks you

want something done, he will go ahead and do it, even when he doesn't understand exactly what you want."

Mrs. Rosella Towers, Educational Specialist in charge of the basic school, Kaiserslautern Army Educational Center, testified that the accused had recently completed certain achievement tests at the school. These showed that he had a reading ability of a person with a fifth grade education. However, the accused's conversational level was about that of a fourth grade student; his general understanding was that of a nine or ten-year-old child.

The accused also testified on the issue of the admissibility of his pretrial statement. He said the Criminal Investigation Division agent never told him he did not have to make any statement regarding the incident. Before signing the statement on April 21, he "talked light conversation" with the sergeant, but he only understood about one-half of the conversation. The statement was read to him, and he was told to sign it. He did not understand the meaning of many of the words which were set out in the statement, such as "structure," "underpants," "sexual intercourse," and the like. Had he known the meaning of these words, he would not have signed the statement. Moreover, if he had known he did not have to give any statement, he would not have done so.

Article 31 provides in part that no person shall request any statement from an accused without first "advising him that he does not have to make any statement." We entertain no doubt this provision requires that an accused who is so "advised" must actually understand his rights. Certainly, a ritualistic reading of the Article in English to an accused who has no knowledge or understanding of that language does not constitute compliance with the Article. See: United States v. Molette, 3 USCMA 674, 14 CMR 92. There is testimony here that the Criminal Investigation Division agent read the Article to the accused, and that the accused indicated an understanding of his rights. However, the accused expressly denies this,

and other evidence tends to corroborate his denial.

The board of review specifically determined, as a fact, that the accused did not understand his rights under Article 31 at the time the statement was taken from him. Since there is substantial evidence to support this finding by the board of review, it is binding upon this Court. See United States v. Wilcher, 4 USCMA 215, 15 CMR 215; United States v. Josey, 3 USCMA 767, 14 CMR 185; United States v. Sell, 3 USCMA 202, 11 CMR 202. The Government says, in its brief, that it does not propose "to invite this Court to disturb such a fact finding." However, it contends that the decision of the United States Supreme Court in Stein v. People of the State of New York, 346 US 156, 97 L ed 1522, 73 S Ct 1077, "requires the board of review to go further and analyze the evidence *aliunde* the confession to determine whether it is sufficient to support the findings of guilty."

A careful reading of Stein v. People of the State of New York, supra, indicates nothing which makes it mandatory for an appellate tribunal, which has determined that a confession was improperly admitted in evidence at the trial, to review the remaining evidence to ascertain if it is sufficient to support a conviction. The issue before the Supreme Court in that case was the constitutionality of a procedure which leaves to the jury the question of the voluntariness of a confession, and authorizes it to reject the confession, but still return a verdict of guilty on the basis of the other evidence. The Supreme Court sustained the procedure as constitutional; however, in so doing, it is apparent that it did not intend to supersede the long-established power of an appellate tribunal to reverse a conviction because of the improper admission in evidence of a confession. Thus, referring to the trial judge's rejection of a defense request that the jury be instructed that, if it finds the confession was coerced, it must acquit, the Supreme Court said:

468

"The claim is also novel. This Court never has decided that reception of a confession into evidence, even if we held it to be coerced, requires an acquittal or discharge of a defendant. On the contrary, this Court has returned all such cases for retrial, which we should not have done if obtaining and attempted use of a coerced confession were enough to require acquittal."

Quite clearly the Stein case has left undisturbed the settled rule that a confession which has been improperly admitted in evidence is ground for setting aside the conviction. See Giron v. Cranor, 116 F Supp 92 (ED Wash 1953).

The board of review in this case has determined, as a fact, that the accused's pretrial statement was obtained from him without compliance with the requirements of Article 31, Uniform Code of Military Justice, supra. Admitting such a statement in evidence, over the accused's objection, constituted error justifying reversal of the conviction. See: United States v. Fisher, 4 USCMA 152, 15 CMR 152; United States v. Josey, supra. Consequently, it was legally correct for the board of review to set aside the findings of guilty and order a rehearing.

Inasmuch as a rehearing is ordered, it is unnecessary to consider the other claims of error. However, ▮▮▮ it is noteworthy that on a number of occasions, the law officer severely limited defense counsel in his cross-examination of prosecution witnesses. The determination of the proper limits of cross-examination is within the sound discretion of the law officer, but we think it appropriate to point out that counsel should be accorded considerable latitude in such examination. The right of cross-examination is a fundamental right and an invaluable means for determination of the truth; it should not be unnecessarily curtailed.

The decision of the board of review is affirmed.

Judge BROSMAN concurs.

LATIMER, Judge (concurring in the result):

I concur with the opinion of the Chief Judge, but consider it advisable to state my reasons for not accepting the Government's contention that this case should be controlled by the holding in Stein v. People of the State of New York, 346 US 156, 97 L ed 1522, 73 S Ct 1077. There are at least three reasons why the rationale of that case is inapplicable to the issue which concerns us. First, the board of review found, as a factual matter, that the accused had not been advised properly of his rights as required by Article 31(b) of the Uniform Code of Military Justice, 50 USC § 602. Second, the court-martial was not instructed on, and did not decide, the issue which prompted the board of review to grant a rehearing. Third, the Stein case did not involve a holding by an intermediate appellate court that incompetent evidence had a prejudicial effect on the triers of fact.

The Government in its brief concedes the power of the board of review to make a factual determination and insists it is not inviting this Court to disturb the board's holding on the "failure to warn" issue. All it maintains is that having made that determination the board of review should have applied the rule announced by the United States Supreme Court in Stein v. People of the State of New York, supra, and affirmed the findings and sentence. Article 66 (c) of the Code, 50 USC § 653, enumerates the powers of a board of review, and it provides that it shall have authority to weigh the evidence, judge the credibility of witnesses, and determine controverted questions of fact. It is authorized to affirm only such findings of guilt as it finds correct in law and fact and determines on the entire basis of the record should be approved. In this instance when the board of review made its factual determination that the accused was not advised properly, the base to support the introduction of the confession into evidence failed and its contents could not then be used to sustain the finding. Absent that incriminatory statement, the board of review concluded there was insufficient testimony in the record to convince it beyond a reasonable doubt that

**469**

the offense had been committed and it refused to affirm the finding. Unless we can overrule the board on the admissibility of the confession, which the Government concedes we cannot do, then a holding that the evidence is not sufficient to meet the burden of proof placed on the Government is binding on us. That is no more than weighing the facts, which a board of review may do; and so we are faced with a situation which is a far cry from the one which confronted the Supreme Court of the United States in Stein v. People of the State of New York, supra. In that case the Supreme Court acknowledged that the New York Court of Appeals had the authority to grant a new trial if for any reason justice demanded that action. Had the New York Court exercised those powers and granted a new trial, the appeal would never have reached the Supreme Court of the United States. In this case an appellate tribunal with comparable authority granted a rehearing and while a procedure which permits the Government to reach this Court is available under the Code, our power to review the question certified is limited to questions of law. The holding by the board of review that the competent evidence in the record does not persuade it that the Government has carried its burden to convince beyond a reasonable doubt does not fall in that category.

Another important difference between this and the Stein case can be found in the posture of the issues and the instructions. The United States Supreme Court there held that, in view of the fact the jury had been instructed to consider the voluntariness of the confessions and to disregard them if they were found to be involuntary, it could be presumed the jury followed the instruction. In the event the instructions given in that case were followed, the confessions were either found to be involuntary and ignored or found to be voluntary and considered. I find no comparable principle which can be relied upon in the instant case. It is conceded the law officer instructed on the question of voluntariness, but, at most, that is only part of the factual question which was determined by the board of review. Here the issue was whether the accused was advised of his rights in such a way as to understand their nature and extent. While it may be argued there was some element of coercion because a sergeant obtained the confession, the instruction given would not require a finding on the important question decided by the board of review. Failure to understand a right does not equal coercion, and to equate this and the Stein case would require us to assume that the court-martial members in this instance understood fully that they could only use the confessions if they found the accused was fully and fairly apprised of his rights and was aware that he need not make any statement. In the absence of an instruction to that effect, it cannot be contended that the principles announced in Stein, supra, are influential.

In United States v. Josey, 3 USCMA 767, 14 CMR 185, I sought to invoke the compelling evidence rule to sustain a conviction when a confession was improperly admitted in evidence. I would use that concept to test the board of review holding in this case as an appellate court is permitted to assess the effect of error for prejudice. Most certainly the contents of this confession had an impact on members of a court-martial. A reasonable doubt of guilt might be present absent the confession but not so if it is considered. No reasonable person could contend that the evidence aliunde the confession compelled a finding of guilty by the court-martial or an affirmance by the board of review. Because of its erroneous admission, the evidence contained in the confession must be eliminated from consideration; when that is done, the board of review was correct in concluding the record was barely sufficient to establish a prima facie case. That is far short of the weight necessary to compel any appellate court to affirm, and prejudice is apparent.