UNITED STATES, Appellee

v

DURWOOD H. DISON, Sergeant, U. S. Army, Appellant

8 USCMA 616, 25 CMR 120

No. 10,462

Decided January 24, 1958

*Miss Madeline DeFina* and *First Lieutenant Hazen V. Hatch* argued the cause for Appellant, Accused. With them on the brief was *Major Edward Fenig.*

*First Lieutenant Chester F. Relyea* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel John G. Lee* and *First Lieutenant Avram G. Hammer.*

## Opinion of the Court

GEORGE W. LATIMER, Judge:

This case involves one specification of larceny, for which the accused was tried and convicted by a general court-martial. We accepted a petition for review after appellate authorities had affirmed.

The accused was the noncommissioned officer in charge of the communication center and Western Union office at Fort Benning, Georgia. Commencing with the evening of February 28, 1957, and proceeding through the fol-

lowing day, the accused was on a drinking spree. Being off the post on March 1, 1957, and well under the influence of intoxicating liquor, he was picked up by the military police at 8:00 p.m. and brought back to his company commander. Thereupon he expressed a desire to go down to the Western Union office, but his commander ordered otherwise and directed that he go to bed and rest. But, with that peculiar sense of determination which possesses the intoxicated, he staggered to his office and attempted to tally up the receipts for the day. Fellow-employees testified that he had difficulty in dialing the telephone and in using the adding machines, that he was "thick tongued" and, although he knew the personnel by name, he appeared intoxicated. The alcohol had the effect of an emetic, for a short time later the accused was witnessed in the throes of a violent reverse peristalsis. After the reprieve from nausea, he abandoned the Western Union office and went into town to seek the comfort of local taverns imaginatively named "Diamond Horseshoe" and "Brass Rail."

Following his departure, employees of Western Union found $1,389 missing. What happened to the money can best be told through the testimony of one of the waitresses at the "Brass Rail," who spoke to the accused:

". . . So I went over there and I asked him what he wanted to tell me, and he said that he had got himself in a lot of trouble. And I asked him what. And he said you know all this drinking I've been doing—he said you know I've been drinking last night and today, and I said, 'That shouldn't get you in trouble' and then he went on to say that he had his pockets full of money. And then he told me—he said he must have been at the place where he was working and put some money in his pocket. He went to the men's room and then he didn't remember any more. And he asked me—he asked me, 'What am I going to do now?', and I said, 'Well, get it back out there as soon as you can'. And then he asked me what time it was and I don't remember whether it was

11:00 o'clock or 12:00. I said it was 15 minutes 'til time for the bus to come. And I told him to go ahead and drink his coffee and that would give him 10 minutes to get to the bus station. And he said, 'All right' and that he was going to take the next bus. I went on waiting on other people, but before I got back up there the MP's come in."

The accused was picked up at midnight, and $1,384.62 was found on his person. Prior to any interrogation, he was advised of his rights under Article 31 of the Uniform Code of Military Justice, 10 USC § 831, but he made two oral statements at 2:00 o'clock and 5:00 o'clock and a written statement at 9:00 o'clock, all on the same morning.

At trial, defense counsel objected to the admission of both oral statements on the grounds that the accused was intoxicated at the time they were made and could not understand the nature and effect of the Article 31 warning. In addition to the evidence hereinbefore related, there was other evidence to support an issue of mental incapacity to understand a warning. We gather this from the Criminal Investigation Division agent's own testimony which indicates that he took the two oral statements from the accused but refused to reduce them to writing because he believed the accused was too drunk to make a statement which would have probative value.

The first error assigned in this case is that the law officer erred in permitting the agent to testify as to the accused's oral statements. At the time these statements were offered, defense counsel objected to their admission, but the law officer overruled him, stating:

". . . This witness [CID Agent Tinsley] will be allowed to continue with his statement of statements made by this accused. However, I want to advise the court that my ruling merely places the statement before the court. It does not conclusively establish the voluntary nature of that statement. At the time this court is given instructions, I will further instruct on the state-

ments that came into evidence at this time."

The law officer did not err in his ruling on admissibility as there was competent evidence in the ■ record from which the court-martial could find that the accused understood his rights and in that regard our grant was too narrow. The error, if any, which we intended to consider arises out of the instructions. On that issue we direct attention to the fact that, in line with his prior advice, at the conclusion of the trial the law officer instructed the court members on the issue of voluntariness in the following language:

". . . Now, you are advised that my ruling, receiving in evidence the first statement, the oral statement, with respect to this offense charged is final only on the question of admissibility. My ruling merely places the statement before the court; it does not conclusively establish the voluntary nature of the statement. Each member of the court, in your deliberation upon the findings of guilt or innocence, may come to your own conclusion as to the voluntary nature of the statement. You may accept the statement as evidence only if you determine that it was voluntary. If you do not determine beyond a reasonable doubt that the statement was voluntary, you must reject it and disregard it as evidence in this case."

Unfortunately, this was not adequate for, under the holding of the Court in United States v Powell, 8 ■ USCMA 381, 24 CMR 191, ■ when an issue is raised as to whether a statement was obtained in violation of any provision of Article 31, the court-martial must be advised that it may only give weight to the statement if it first finds that it was made in accordance with that Article. The question in this instance and the one needing emphasis was not so much voluntariness but rather whether the accused understood the nature of the Article 31 warning, and it was failure on the part of the law officer to charge the court clearly on this princi-

ple which makes the instructions inadequate.

A similar problem was before us in United States v Hernandez, 4 USCMA 465, 16 CMR 39. In that case, a pretrial statement was introduced into evidence after an investigator read and explained in English accused's rights under Article 31. The accused, whose native tongue was Spanish, testified that he did not understand all of the conversation with the investigator, and other witnesses also testified to his lack of comprehension of the English language. The board of review reversed the decision of the court-martial, and we concurred in the action based upon the fact that, in order to comply with Article 31, an accused must actually understand the nature of the warning. There, because the board of review found as a factual matter that an effective warning had not been given and that the law officer had erred in admitting the testimony, the contents of and the necessity for giving instructions to the court was not decided. But it was concluded that before Article 31 has been complied with, it must appear that the accused was mentally able to understand his rights.

In the case at bar, we do not have a factual finding by the board of review, and we are faced squarely with determining the necessity of the law officer instructing the court on the manner in which it should consider the evidence touching on accused's understanding of his rights. In the light of the present record, we are at a loss to understand how a court could be advised properly unless at some time during the course of his instruction the law officer marked out the field of warning under Article 31 and informed the court members that if they found the intoxicated condition of the accused was of such a degree that he was unable to understand the warning given, then they should find a failure to comply with Article 31 and give no weight to his oral statements. While the instructions covered involuntariness, that is insufficient in this setting, for failure to know about a privilege does not necessarily equal coercion, inducement, or unlawful influence, and we are sure that absent spe-

**619**

cific guidance, the court members would not understand how to apply the accused's befuddled mentality to his right to be warned. Particularly is that true when intoxication was instructed upon, but its effect was definitely limited to the mental capacity to form a specific intent. Prejudice is apparent, for had the court known it must disregard the statement if the accused was uninformed concerning his privileges, damaging testimony could have been given no weight. As it was, the statements contained the accused's admissions that "he intended to take off" with the money. That is the only positive evidence of intent permanently to deprive the true owner of the money, and the court undoubtedly was influenced by accused's self-incriminating declarations.

Because this case may be reheard, we deem it advisable to discuss the remaining error assigned. The accused asserts that the law officer should have instructed sua sponte as to the lesser included offense of wrongful appropriation. With this contention we must agree although in some instances intoxication might pose an all-or-nothing charge. Here the enunciations of trial defense counsel are pied with references to intoxication and specific intent, and defense witnesses depicted the accused as a man who had cast himself in the leading role of his own production of "Lost Weekend." However, as the issue was presented by the record, the taking was admitted and the only question concerned the intent. It is true, as asserted by the Government, that wrongful appropriation, as well as larceny, requires a specific intent which could not be entertained by the accused if his intoxication had reached a certain point. But the evidence of record permitted a finding, and the court found that he had the mental capacity to form an intent to deprive. Permissibly, the facts can be interpreted reasonably to establish that accused's intent was to temporarily withhold the money. When the facts raise reasonably a lesser degree of the principal offense, there is a duty on the law officer to instruct on that crime, and his failure to do so requires reversal. See United States v Wilson, 7 USCMA 713, 23 CMR 177; United States v Mundy, 2 USCMA 500, 9 CMR 130; United States v Williams, 1 USCMA 186, 2 CMR 92.

The decision of the board of review is reversed, and the record is returned to The Judge Advocate General of the Army for action not inconsistent with this opinion.

Chief Judge QUINN and Judge FERGUSON concur.