UNITED STATES, Appellee

v

HENRY W. ERB, Technical Sergeant, U. S. Air Force, Appellant

12 USCMA 524, 31 CMR 110

526

No. 14,863

November 24, 1961

*Frederick Bernays Wiener, Esquire*, argued the cause for Appellant, Accused. With him on the brief was *Major Quincey W. Tucker, Jr.*

*Major James Taylor, Jr.*, argued the cause for Appellee, United States. With him on the brief was *Colonel Merlin W. Baker*.

## Opinion of the Court

QUINN, Chief Judge:

Early on the morning of June 3, 1959, the accused stabbed his wife to death with a large kitchen knife. Shortly after he inflicted the fatal wounds, he reported the stabbing to the Air Police by telephone. Two officers proceeded to the accused's home, and found Mrs. Erb on the living room floor with a knife protruding from her chest. They took the accused into custody. That afternoon the accused signed a written statement in which he admitted he quarreled with his wife because he had lost "all . . . [the money they] had" in a slot machine in the noncommissioned officers' club. In the course of the quarrel she slapped him. He got a knife from a rack on the kitchen wall, and stabbed her with it a number of times.

For several months after the homicide, the accused was hospitalized for treatment and evaluation of a mental illness. He was examined by three boards of medical officers, in both Japan and the United States. Specific findings by the third board which was convened at Sheppard Air Force Base hospital, in Texas, indicated that the accused possessed sufficient mental capacity to be legally responsible for the death of his wife; and that he was mentally competent to stand trial. Accordingly, he was returned to Japan, and, in due course, was brought to trial before a general court-martial at Fuchu Air Station on a charge of premeditated murder. He was convicted as charged, and sentenced to a dishonorable discharge, confinement at hard labor for life, and accessory penalties.

No dispute exists over the fact that Barbara Erb died as a result of stab wounds on June 3, 1959. Also uncontroverted is the fact that the accused inflicted the fatal wounds. However, the accused challenges the validity of the pretrial psychiatric evaluation to which he was subjected, and the correctness of certain instructions dealing with his mental condition at the time of his confession.

As a background to the attack on the pretrial psychiatric procedures, the accused reverts to his hospitalization for psychiatric treatment in November 1958. At that time the accused was a member of the Tenth Weather Group at Tokyo Weather Station, Fuchu Air Base. He was generally regarded as a quiet, well-mannered person. With his wife and infant daughter he occupied quarters in a Government housing area. To one of their neighbors the Erbs outwardly "seemed like a happy family." In fact, they faced serious problems. On November 26, 1958, the accused told his chaplain that "several times during the past two weeks [he had] been on the verge of killing his wife . . . and then committing suicide." He was taken to Tachikawa Air Force hospital and placed in a closed ward because he appeared to be suffering from a "Manic-Depressive Psychosis, Depressed Type, Acute." Drug treatment was prescribed. However, on November 27 a medical report shows an "initial impression" of "personality disturbance."

On December 1, the accused was assigned to occupational therapy, with a provisional diagnosis of manic-depressive reaction. On December 4, on order of the attending physician, the accused was transferred to an open ward. He was released from the hospital and returned to duty on December 10, 1958. The final diagnosis shown on the record was "Neurotic depressive reaction, acute, moderate."

At the time of his discharge from the hospital, the accused was instructed to report back if he experienced any further difficulty. However, he never returned for treatment until his commitment after the homicide. In his pretrial statement, the accused said he telephoned Dr. Barkin, the attending physician in his earlier hospitalization, once in February 1959; and he "saw him again at the hospital when [he] had [his] wife in for a check-up." (Mrs. Erb was then pregnant; she gave birth to a son in April 1959.) On the afternoon of the killing, the accused was sent again to the hospital. He was seen "briefly" by Captain R. W. Anderson, an Air Force psychiatrist, who reported that he appeared to be withdrawn and depressed. On June 9, Captain Anderson "extensively" interviewed and examined him. The accused talked at length about his gambling losses and the consequential deteriorating relationship with his wife. Captain Anderson was of the opinion that at the time of the homicide the accused could not "in any degree" distinguish right from wrong. He was also of the opinion the accused "was misdiagnosed in November and December." On July 6, 1959, a medical board, which included Captain Anderson as a member, concluded the accused suffered from a "schizophrenic reaction" at the time of the homicide and was not then so far free from mental defect and derangement as to be able to distinguish right from wrong; to adhere to the right; and to form the degree of premeditation required for the offense charged. At the same time, the board found the accused had so recompensated since the offense as to possess sufficient mental capacity to understand the nature of the proceedings against him and intelli-

gently to conduct or cooperate in his defense. One member of the board, Captain J. R. Dubois, Jr., a neuropsychiatrist, later testified that he disagreed with the findings of the board; in his opinion, the accused was able to distinguish right from wrong, and there was only "partial impairment" of his ability to adhere to the right as a result of the schizophrenic condition.

Acting on a recommendation from the hospital that the accused "be medically evacuated" to the United States for psychiatric treatment, the commander of the Support Wing to which accused's organization was attached forwarded the charge sheet and the hospital report to Air Division. He recommended the charge be dismissed, and that disposition of the case be effected through medical channels. At the suggestion of Major W. C. Marsh, Jr., Chief of Military Justice in the office of the Staff Judge Advocate of the Air Division, and the concurrence of the Staff Judge Advocate, the Air Division commander directed Wing to obtain a complete description of the premises of the homicide, especially the respective locations of the knife rack on the kitchen wall and Mrs. Erb's body on the living room floor. It was believed desirable to return the accused to the United States, but the additional description of the scene of the homicide was deemed necessary for use in the medical evaluation in the Zone of Interior. Wing furnished the "additional information requested," which was forwarded by Air Division to Sheppard Air Force Base, Texas, as the authority "presently exercising general court-martial jurisdiction" over the accused. The entire file was submitted to Sheppard for "appropriate disposition."

Tachikawa hospital transferred the accused to Travis Air Force Base. From there he was transferred to Sheppard Air Force Base hospital, and admitted on August 22, 1959. Twelve days later a Competency Board, composed of three medical officers, was convened to consider the accused's mental condition. Captain Branham, the attending psychiatrist, presented the case to the board. However, diagnosis was deferred because the board believed fur-

ther observation of the accused was necessary.

On November 19, 1959, a new sanity board was appointed. Captain Branham was substituted for Captain B. W. Hendry as one of the members of the board because a new policy of the Chief of the hospital's Division of Psychiatry and Neurology required that the doctor "personally responsible" for the patient be a member of the board. This board met on November 21. It diagnosed the accused's mental condition as "Schizophrenic reaction, latent, chronic," which it described as not constituting "an overt psychosis." It found the accused was suffering from mental illness, but he could distinguish right from wrong, and with "a moderate degree of impairment" could also adhere to the right in regard to the offense charged. The board also found that the accused had "impaired" ability to form the "necessary specific intent implied by the offense of homicide." It recommended that all the factors set out in its report be "strongly considered in reaching a decision" as to ultimate disposition of the accused.

About a week after the board's report, Headquarters, U. S. Air Force, telegraphed U. S. Pacific Air Force. It referred to the findings and said that the "overwhelming number" of witnesses in Japan "dictates desirability" of returning the accused to Japan for trial. It requested "comments." In turn, Pacific Air Force asked for the views of the subordinate commanders that might have jurisdiction over the accused if he were returned to Japan. One of the major commands said it had "no objection" to holding the trial in Japan, but it understood that Pacific Air Force "would make the necessary determination." Pacific then notified headquarters that the "situation makes it desirable that the accused be tried in Japan." It further indicated the accused "should be transferred" to the air division in which he had originally been. Eventually, the accused was assigned to Fuchu Air Base, and the commander of air division referred the charge of premeditated murder to trial.

Proceeding on the premise that the commander of air division was dissatisfied with the findings of the medical board at Tachikawa hospital in July 1959, the accused contends he was transferred to the United States only for the purpose of subjecting him to "psychiatric bombardment" until such time as a medical board could be found to certify him as mentally competent. To bolster the argument, he maintains the findings of the Tachikawa board are "inherently more reliable [than those of the board at the Sheppard hospital], and must be accepted." Assuming the division commander was affirmatively displeased with the Tachikawa board's findings, the record presented to us compellingly indicates that neither he nor any other commander attempted to influence the psychiatrists at Sheppard Air Force Base for the purpose of obtaining findings contrary to those reached by the sanity board at Tachikawa hospital. He divested himself of jurisdiction when he forwarded the charge sheet and the whole file to Sheppard Air Force Base for "appropriate disposition." And the basic decision to return the accused to Japan for trial was made by competent authority in the United States and the commander of Pacific Air Force. Moreover, it is difficult to draw a sinister inference from the fact that the accused was examined and evaluated by other medical boards.

Psychiatry is not an exact science; and individual psychiatrists may differ strongly in their findings regarding an accused. United States v Carey, 11 USCMA 443, 29 CMR 259; United States v Kunak, 5 USCMA 346, 17 CMR 346, separate opinion by Chief Judge Quinn. The Manual for Courts-Martial, United States, 1951, specifically recognizes that the surrounding circumstances may justify successive mental examinations. Manual for Courts-Martial, supra, paragraph 121. Nevertheless, the appellant urges us to apply to the medical board proceedings, a principle analogous to that which prohibits twice putting an accused in jeopardy. Medical board proceedings, of course, are not judicial in nature, purpose, or ef-

fect; they are entirely administrative. We observed in United States v Vaughan, 3 USCMA 121, 124, 11 CMR 121, that "action of an undiluted administrative character, can, in itself, contain no latent double jeopardy problems." Medical opinion is unquestionably important in cases of this kind, but the ultimate decision as to accused's legal responsibility for the commission of the offense charged is a matter for judicial determination. United States v Carey, supra; see also United States v Kunak, supra, separate opinion by Chief Judge Quinn. Consequently, the findings of the medical board cannot preclude trial and conviction by a court-martial.

Not a scintilla of evidence exists in the record of the preliminary proceedings to indicate that any of the board findings were the result of, or influenced by, command control. Almost all the doctors who examined the accused in Japan and in the United States testified at the trial. The testimony of each clearly and convincingly shows his opinion was entirely his own, and was reached without regard to any official or unofficial pressures. See United States v Smith, 5 USCMA 314, 17 CMR 314. In sum, we find no merit in the claim of "psychiatric bombardment" for the purpose of obtaining favorable findings on mental capacity.

Referring to some language used by the board of review in overruling the assignment of error discussed above, the accused contends it constitutes improper criticism of appellate defense counsel and "demonstrates a bias so deep-seeded as to vitiate" the board of review's decision. Before the board of review, appellate defense counsel had contended that the treatment accorded the accused after the Tachikawa board's report, was "directed to a single end, viz., to obtain, without regard to their reliability or trustworthiness, a set of board findings that would make it possible for this accused to be brought to trial and convicted." Considering the allegation, the board of review said:

". . . We are constrained to comment upon assignments of this nature for we look with disfavor upon unfounded accusations against those who are not only commissioned officers in the military service, who historically have lived by a code of conduct others might find burdensome, but in addition, are also members of honorable professions and as such bound by the oath or code of ethics of such profession or both. The assignment and the argument in support are so worded as to infer, in not the weakest of language, what would have to be a conspiracy between the convening authority plus his legal staff located in Japan and members of the staff of the USAF Hospital at Sheppard Air Force Base to declare accused sane, and therefore mentally responsible for the homicide, regardless of his mental condition. The argument in support of the assignment is devoid of fact but contains instead a series of innuendoes and tenuous inferences. Due to the nature of the accusation, however, we have carefully examined the record of trial and the allied papers and find not the slightest appearance of evil, much less evil itself (United States v Walters, 4 USCMA 617, 16 CMR 191).

. . . . . .

". . . The record of trial contains the sworn testimony of Major Grissom that the board which met in September did not return a finding because the members felt that the information on accused was, at that time, insufficient to satisfactorily answer all the questions involved, but recommended reconvening in 30 to 60 days. He also testified that the policy with respect to sanity board membership was changed so as to include in the membership of the board, the medical officer primarily responsible for the patient. Suffice it to say that this Board of Review accepts the sworn testimony of a medical officer, whose only connection with the case was the psychiatric evaluation of accused, over the unsupported and unfounded assertions of his counsel on appeal, individuals whose interest in an accused's case is partisan by its very nature and all too often not purely professional but personal as well."

We are not persuaded that the quoted remarks show prejudice toward appellate defense counsel or reflect a predisposition to disregard all challenges to the official actions of military commanders. It was wrong to ascribe to appellate defense counsel a personal and not "purely professional interest" in the case; but neither the language of the quotation, nor the opinion as a whole, demonstrates such injudiciousness as to disqualify the board of review from consideration of the appeal on the merits. Cf. United States v Lynch, 9 USCMA 523, 26 CMR 303. We have pointed out in other cases that the official act of a person engaged in the administration of military justice is not invalidated merely because he entertains opinions and attitudes which are contrary to established rules of law. To set aside the official act, it must appear that the erroneous idea or sentiment influenced the official decision. United States v Plummer, 7 USCMA 630, 23 CMR 94; United States v Deain, 5 USCMA 44, 17 CMR 44. In the *Deain* case, for example, the president of the court-martial which tried the accused said he did not believe military persons were entitled to any rights under the U. S. Constitution, and that he disagreed with provisions of the Uniform Code of Military Justice. Commenting on the effects of these views, we said:

"Appellate defense counsel have urged upon us Admiral Ruddock's statement that he did not regard military personnel as possessing any constitutional rights other than those which may have been duplicated by specific grants from Congress, and have also called our attention to his criticism of the Uniform Code. As to the former, we disagree with Admiral Ruddock. See United States v Voorhees, 4 USCMA 509, 16 CMR 83. As to the latter, the record is silent concerning the particulars of his disagreement with the Uniform Code, but the omission is unimportant. As far as both matters touch our problem, we are unwilling to hold that, standing alone, they indicate sufficient bias or partiality against this accused, or accused persons in general, to sustain the challenge. Cf. Carnaggio v State, 143 Miss 694, 109 So 732. The statements do indicate strange conceptions of military law, but the accused has not shown, and we cannot find, in these theoretical pronouncements any substantial danger to a fair and impartial trial."

Disqualification is also asserted against the trial counsel, Major Marsh. The accused contends that Major Marsh was ineligible to prosecute the case because he "simultaneously, [acted] as legal advisor to the convening authority on the conduct of the prosecution." The contention is based upon the fact that both before and after he assumed the duties of trial counsel, Major Marsh was Chief of the Military Justice Division in the office of the Staff Judge Advocate to the convening authority.

Major Marsh became trial counsel on March 28, 1960. In July 1959, in his capacity as chief of military justice, he had read the report of the Tachikawa medical board, and recommended to the staff judge advocate that "some further inquiry was warranted." The recommendation was passed on to, and accepted by, the division commander, who, it will be recalled, directed the wing commander to obtain additional data about the scene of the homicide. After becoming trial counsel, Major Marsh, acting as chief of military justice, prepared and transmitted several messages to Sheppard Air Force Base inquiring into the availability as witnesses of some of the doctors who had examined the accused during his confinement in the hospital on that base. The accused maintains that these acts are of a staff judge advocate "nature" and effected an improper "merger of . . . prosecutorial and judicial functions in the same individual."

As a judge advocate general officer, Major Marsh could be called upon to perform many duties. See United States v Hurt, 9 USCMA 735, 27 CMR 3. The Uniform Code recognizes that a change of duty in regard to the same case may result in a conflict of function. Article 6 (c) prohibits the trial counsel in a case from "later act[ing] as a staff judge advocate . . . upon

**531**

the same case." The purpose of the prohibition against dual ▮▮▮▮▮▮ ▮ function in the same case is "to preclude situations which impair or destroy the fairness and impartiality of the proceedings against the accused." United States v Hightower, 5 USCMA 385, 18 CMR 9. Major Marsh was not the staff judge advocate. He did not fall, therefore, within the express prohibition of Article 6. His eligibility to serve in the two capacities must be judged by the test of incompatibility between his functions as trial counsel and his actions as chief of military justice. United States v Hayes, 7 USCMA 477, 22 CMR 267; United States v Hurt, supra.

Elaborate discussion is not needed to establish compatibility between the impartiality of a request for ▮▮▮▮▮▮ ▮ additional facts for use in a later medical evaluation of the accused and later action as trial counsel; similarly, compatibility is equally evident in the request as chief of military justice, for information regarding the availability of witnesses. United States v DeAngelis, 3 USCMA 298, 12 CMR 54; cf. United States v Turner, 7 USCMA 38, 21 CMR 164. However, going beyond the record of Major Marsh's conduct, the accused alleges that since the Major was chief of military justice he must have had something to do with the selection of the court members. The accused concedes there is no "proof" of participation, but he maintains the Government has the burden of affirmatively showing that Major Marsh had no connection with the selection process. See United States v Moses, 11 CMR 281.

For the purposes of this case, we may assume it is the "usual" practice, as the accused contends, for a staff judge advocate to recommend to the convening authority suitable personnel for court-martial service and that the chief of military justice acts as his *alter ego* in that matter. We may further assume these circumstances cast upon the Government at least the burden of going forward with the proof to overcome the inference in a particular case. The record demonstrates that the burden was met here.

**532**

If Major Marsh "hand-picked" the court members, we would not expect him to challenge any of ▮▮▮▮▮▮ ▮ them for cause, much less exercise his peremptory challenge. Yet, he challenged one of the members of the court-martial for cause because the member had conscientious scruples against the imposition of capital punishment; he joined defense counsel in another challenge for cause because the member indicated he did not look with favor upon the defense of insanity; and he peremptorily challenged a third member of the panel. Besides the inconsistency of challenging supposedly preselected court members, there is an affirmative statement of fair dealing in the record. The Major submitted a chronology of his acts in "processing" the case in connection with a defense motion to dismiss the charge for lack of speedy prosecution. In it, he said he had not engaged in "any conduct designed to handicap or oppress the accused." The statement was unchallenged and uncontradicted. It stands broadly opposed to the charge that he chose the court members he personally desired.

Turning to the trial itself, the accused advances three separate claims of prejudicial error. He alleges first that the president of the court-martial deprived him of a fair trial. The allegation has two parts, the first of which concerns an out-of-court conversation between the president and Dr. Anderson, the principal medical witness for the defense. Disclosure of the conversation was made by the president in open court. In the course of Dr. Branham's examination of his findings as the accused's attending physician at Sheppard Air Force Base hospital, he was asked if there are any "chemical or physical . . . tests" by which a psychiatrist could establish "absolutely a diagnosis of schizophrenic." The president of the court interrupted to say he did not think the witness should answer the question. He said his objection was based on the fact that on the previous day he had had an "intellectual discussion" with one of the doctors, and "This point was discussed partially." The president further said

the conversation "had nothing to do with the trial"; he "just got interested in the gentleman and talked to him later on [a matter], unrelated to the trial." He had merely interposed the objection "to get things straight, to be fair to everybody." The assistant trial counsel also spoke up. He said he had heard the conversation. He told Dr. Anderson at the time that he could not discuss "any facts pertaining to this trial." He was assured the matter under discussion "had nothing to do with the trial." While the assistant trial counsel did not know what Dr. Anderson and the president said specifically, he believed the general subject was "chemistry."

No objection to the account of the out-of-court conversation was made by defense counsel. Nor did ▪ the defense call Dr. Anderson to verify or to deny the nature of the discussion. The record of trial suggests a strong reason for the defense acceptance of the president's version of the incident. Earlier, Dr. Anderson had testified extensively on the effects of the schizophrenic condition which he found in the accused. Explaining the phenomenon of decompensation, he interpolated some comments on the nature of schizophrenia. Included in his interpolation was a statement to the effect that it was "reasonable to assume that brain function could be altered by changes in [the] chemistry" of the brain. He further testified that under this theory "if we had the tools to assay" imbalances in brain chemistry, "we could measure [the physical entity] in some quantitative form." This theoretical discussion was of special interest to the president. During the *voir dire* examination, defense counsel had established that the president had expertise in drugs and chemicals of medical application. One of these was an experimental drug which could produce "pseudo-schizophrenia." Thus, Dr. Anderson's testimony and the president's background in drugs and chemicals clearly indicate the out-of-court "intellectual discussion" between the two concerned the future possibilities of determining mental illness from imbalances in brain chemistry. Quite clearly, this is the light in which defense counsel regarded the conversation. And it is equally clear defense counsel was satisfied the discussion could not possibly prejudice the accused. Thus, the presumption of prejudice that arises on a showing that a member of the court had a private conversation with a third person in regard to a matter pertaining to the case, which is pressed upon us on this appeal, is fully rebutted by the record of trial. We hold, therefore, that while it was unwise of the president to engage Dr. Anderson in conversation, there is no fair risk the discussion prejudiced any substantial right of the accused.

Moving to the second part of his attack on the president's conduct, the accused contends he was prejudiced by "aggressive cross-examination" of the medical witnesses. We need not detail the numerous questions asked, and the statements made by the president. Neither need we consider, as the Government contends we should, whether defense counsel actually invited a probing examination of the witnesses.[1] It is

---

[1] Government counsel in their thorough brief point out that, in the first 333 pages of the record, the president asked only a few questions. Then, the following colloquy took place, and, thereafter, the questions were frequent and searching:

"Col Childress [a member]: We have been asked from time to time if we have any questions.

"LO: Yes, sir.

"Col Childress: What would be proper to be an acceptable question of the witness?

"LO: Well, if you ask—excuse me.

"Col Childress: The frameworks of the questions, perimeters of the questions that could be asked?

"LO: If the court asks some questions concerning facts which have been testified to or which even they believe to be in the same knowledge, they could ask that question. However, as they are sitting as an impartial panel and must not assume the role of an advocate in the case, but if they have some doubt in mind as to some factual situation, then they can ask the question, and if it is within the witness' knowledge he will be permitted to answer. Normally, the procedure would be to first get

not the number of the questions, but the fact of partisanship ■ that is the fundamental issue in an allegation of this kind. In other words, did the president act as an impartial fact finder or did he take on the mantle of a Government advocate? United States v Blankenship, 7 USCMA 328, 22 CMR 118; United States v Carver, 6 USCMA 258, 19 CMR 384. The accused contends the president displayed "a basic and disqualifying partiality" toward the prosecution. See United States v Marshall, 12 USCMA 117, 30 CMR 117. Here, the record extracts set out in ■ the accused's own brief show the president was primarily concerned with the psychiatric testimony; they further show that the substance of his inquiries was virtually the same for both prosecution and defense doctors.[2] It may be that the pres-

ident talked too much; but nothing he said evinces partiality or a prejudgment of the merits of the issues. See United States v Smith, 6 USCMA 521, 20 CMR 237. We agree with the holding of the board of review below that the record of trial shows "no indication of partisanship."

Two assignments of error concern the instructions. In the first, the accused maintains the law officer erred in denying a request for the following instruction:

"With regard to the opinion testimony of the several psychiatrists as expert witnesses, the court is instructed that the longer the period of time between the offense and the psychiatric evaluation or examination, the less chance there is of detecting factors for making a good evaluation."

---

permission of the president of the court to ask the question, then state your name for the benefit of the reporter, so she can signify the member asking the question.

"DC: May I say something?

"LO: Yes.

"DC: Since we are the defense, I am sure we would not object to any questions. It has been my experience—I am sure others here have had the same experience—we have found many times a point will come into the minds of the court that is a very important point, and the defense never even thought of it, or perhaps to the trial counsel and he never thought of it, but it is a point we would like to have in the trial and none of us thought of it, but it would occur to some member of the court. Sometimes I think members of the court might feel hesitant in inquiring into it, perhaps getting into an area neither side wanted probed into. If it should develop into a question we thought should not be answered, of course, we would interpose an objection. As far as the defense is concerned, I feel if any member of the court has any question they would like to ask the witness on any point we are talking about here, we certainly have no objection."

Later, the president asked if some of his questions were "within bounds." Defense counsel replied: "We have no objection."

**534**

[2] The following exchange establishes the point without the necessity of separately stating numerous questions:

Examination of Captain Dubois, a prosecution witness:

"Q [Pres.] Furthermore, do you agree that under sufficient stimulus, his adjustment or compensation is either badly impaired or terminated?

"A Yes.

"Q He becomes involuntarily subject to a dissociated state?

"A That is possible.

"Q Do you agree that, if sufficient, this stimulation could cause reason no longer to restrain him and he becomes incapable of adhering to the right and even distinguishing right from wrong?

"A If the stimulus were severe enough.

"Q It would seem to me, with reference to the events of 3 June . . .

"LO: Colonel, I wouldn't express any opinions at this point.

"PRES: I want to present two points, two possibilities.

"TC: I think, sir, this is a question that Colonel Milch read yesterday and addressed to a witness [Dr. Anderson, who testified for the defense].

"PRES: The expert witness, exactly the same question, presenting two possibilities, presenting two different points.

"LO: Very well."

The requested instruction is abstracted from testimony by a clinical psychologist in the case of United States v Somerville, 19 CMR 655, 660. Appellate defense counsel maintain the statement is a factual truism which, in view of the inconstant character of the accused's schizophrenic condition, was "absolutely necessary" to call to the attention of the court-martial. They say the request has legal support in a comment by the United States Supreme Court on the "difficulties of retrospectively determining . . . competency as of more than a year ago." Dusky v United States, 362 US 402, 4 L ed 2d 824, 80 S Ct 788.

There may indeed be difficulties in evaluating the mental condition of an accused a considerable time after the offense, but difficulty is not the equivalent of inexactitude. An evaluation made some time after the offense may be a perfectly good one. The requested instruction, however, implies that a delayed psychiatric evaluation is not likely to be good. The implication is contrary to many cases that have come before this Court; and it is not at all supported by the comment in the *Dusky* case. See United States v Washington, 6 USCMA 114, 19 CMR 240; United States v Smith, supra; United States v Kunak, supra. Time of evaluation is only one of many factors the court-martial may consider in determining what weight to accord the testimony of a psychiatrist. Among other things, the court-martial may consider differences in the training and background of the doctors, and differences in the period of time available for, or devoted to, examination of the accused.[3] The law officer, therefore, was entirely correct in refusing to single out time of examination as a circumstance meriting special instruction. United States v Harris, 6 USCMA 736, 21 CMR 58.

In the final assignment of error the accused challenges the law officer's instructions on the right of the court-martial to disregard a pretrial statement admitted into evidence. The statement was made by the accused. Prosecution witnesses testified that the accused appeared to be normal when he made the statement. However, Dr. Anderson said that in his opinion the accused was "overtly psychotic" at the time and his statement was "probably not volitional." Admitting the statement into evidence, the law officer instructed the court-martial on its right to disregard it. He repeated the advice, without objection, in final instructions to the court. The questioned instruction as first given, is as follows:

". . . Evidence has been presented in this case which places in issue the question of mental competency of the accused at the time he was informed of his rights under Article 31, as well as at the time of his making the statement. You are instructed that, if you find the accused had a mental disease, defect, or derangement to such a degree that he was unable to understand the warning given or which deprived him of mental freedom to confess or deny participation in the offense, or which preclude him from exercising his volition to refuse to make a statement, or which compelled him to make a statement, then you must find a failure to comply with Article 31 in the first instance, or find the statement was involuntarily given in the other instances. In any of these events, you must give no weight to the statement given by the accused. Also, if you find that the accused was not mentally competent at the time he made the statement, then you must give no weight to the statement. The mental competency of the accused has already been raised at this trial, and I assume I will be called upon later to instruct the court regarding the mental responsibility or capacity of the accused, or both of them, at a later time in this trial. *You will consider those instructions in connection*

---

[3] These differences were stressed by both trial and defense counsel in closing argument. Defense counsel argued that the Tachikawa evaluation was "entitled to . . . the greater weight" because the doctors "saw the accused shortly after the incident" and were "more qualified" in experience and training.

*with the instructions I have just given you."* [Emphasis supplied.]

Lack of mental capacity at the time of the making of a confession will render it inadmissible in evidence. Blackburn v Alabama, 361 US 199, 4 L ed 2d 242, 80 S Ct 274; United States v Dison, 8 USCMA 616, 25 CMR 120. The burden of establishing the admissibility of a confession rests upon the Government. United States v Josey, 3 USCMA 767, 14 CMR 185. The accused contends the instruction in issue shifted the burden to him, and required the court-martial to find affirmatively that he had some mental disease or defect before it could disregard his pretrial statement. Cf. United States v Troutt, 8 USCMA 436, 24 CMR 246; United States v Rowan, 4 USCMA 430, 16 CMR 4. At the outset, it is distinctly arguable that the purported error was waived. The record shows defense counsel was constantly alert to the adequacy of rulings and instructions by the law officer. He was specifically asked if he was satisfied with the instruction now challenged, and replied that he had "no objection." See United States v Sanchez, 11 USCMA 216, 29 CMR 32.[4] We put aside that matter, however, to reach the merits of the assignment of error.

The Government contends the instructions are sanctioned by our opinion in United States v Dison, supra; see also Wilson v United States, 162 US 613, 40 L ed 1090, 16 S Ct 895; cf. Mora v United States, 190 F2d 749 (CA 5th Cir) (1951). In the *Dison* case, the law officer gave a general instruction on the court-martial's right to determine the voluntariness of a confession. He made no mention of the effect of evidence of substantial intoxication at the time. We held that the standard general instruction on voluntariness did not cover the specific issue of whether the accused understood the nature of the Article 31 advice given to him. In the course of the opinion we said:

". . . In the light of the present record, we are at a loss to understand how a court could be advised properly unless at some time during the course of his instruction the law officer marked out the field of warning under Article 31 and informed the court members that *if they found the intoxicated condition of the accused was of such a degree that he was unable to understand the warning given,* then they should find a failure to comply with Article 31 and give no weight to his oral statements." [Emphasis supplied.]

Our statement in the *Dison* case was not intended as a model instruction. It merely emphasized that a correct general instruction can be entirely inadequate in a specialized situation. *Dison,* therefore, does not answer the accused's claim of error. More to the point is the Government's contention that the challenged instruction does not stand alone. When the statement was admitted into evidence the law officer advised the court-martial that his instruction on voluntariness was to be considered "in connection with" his later instructions on the accused's mental responsibility.

Initial instructions on voluntariness at the time of the admission in evidence of a pretrial statement need not be definitive. See United States v Sanchez, supra, dissenting opinion by Judge Ferguson. Properly, instructions on the right of the court-martial to reject the pretrial statement can be left to the final instructions, when all the issues to be determined by the court are submitted to it for decision. See United States v Jones, 7 USCMA 623, 23 CMR 87; United States v Sanchez, supra, opinion by Judge Ferguson. As directed by the instruction itself, we must consider it in conjunction with the other instructions on the accused's mental condition. The Government observes in its brief, and the record of trial shows, that the law officer repeatedly informed the court that the prosecution had the burden of estab-

---

[4] Additionally, the board of review summarized Captain Anderson's testimony as indicating merely "a possibility" that the accused might not have understood the advice as to his rights under Article 31.

lishing sanity beyond a reasonable doubt. The questioned instruction does not itself refer to the · standard of proof to be applied by the court-martial in determining the accused's sanity at the time of his pretrial statement. On that point, it was amplified by the other instructions. There is, therefore, no fair risk that the court-martial was misled as to the burden of proof. United States v Sanchez, supra; United States v Smith, 11 USCMA 321, 323, 29 CMR 137. In the *Smith* case, we said:

> ". . . In short, there is no intimation in the instruction as to who has the burden of proof. That matter was covered at length later in the instructions, and it was stressed repeatedly that the burden was on the Government. Accordingly, we find no merit in this claim of error."

The decision of the board of review is affirmed.

Judge KILDAY concurs.

FERGUSON, Judge (dissenting):

I dissent.

With all respect, I am compelled to disagree with the ultimate conclusion of my brothers that reversal is not required in this case. While I am not fully in accord with the views expressed by the principal opinion concerning any issue, I believe it necessary to record my position only on the propriety of the law officer's instructions concerning the accused's mental state and its effect upon his ability both to understand the provisions of Uniform Code of Military Justice, Article 31, 10 USC § 831, and to make an informed choice either to answer questions put to him or to remain silent.

The accused committed the act with which he was charged in the dawn hours of June 3, 1959. After proper warning under Code, supra, Article 31, he was interrogated by military investigators from 10:30 a.m. until 11:55 a.m. The questioning was resumed at 12:55 p.m., and accused dictated a statement in which he confessed the slaying.

Agents testified that accused cried and sobbed during the first period of interrogation and, although more composed in ·the afternoon, still appeared distraught.

Immediately after his statement was completed, accused was hospitalized for psychiatric observation. On July 6, 1959, psychiatrists concluded that accused was psychotic at the time of his acts. Later, other psychiatrists examined and observed the accused at Sheppard Air Force Base. On November 12, 1959, this group concluded that accused was mentally responsible at the time of the homicide but that his act triggered a psychotic episode. At least one expert witness was of the belief that accused was at all times mentally responsible.

Accused's condition at the time of his interrogation was most extensively described in the testimony of Dr. Anderson, the psychiatrist in whose custody he was first placed after making a statement. Dr. Anderson expressed the view that accused was psychotic during the period of his interrogation and, conceding his ability perhaps "intellectually" to comprehend the terms of the warning afforded him, opined that accused was unable meaningfully to exercise his rights under the Article. There is other evidence to the contrary, but there is no doubt that the evidence raises an issue concerning accused's ability to understand and apply his right to remain silent. On this point, my brothers and I agree.

Thus, the issue with regard to the accused's confession narrows to the sufficiency of the law officer's instructions. With respect to this matter, he advised the court-martial as follows:

> "Evidence has been presented in this case which places in issue the question of the mental competency of the accused at the time he was informed of his rights under Article 31, as well as at the time of his making of the statement. *You are instructed that if you find the accused had a mental disease, defect or derangement, including a character or behavior disorder, to such a degree that he was unable to understand the warning given or which deprived him*

537

*of mental freedom to confess or deny participation in the offense, or which precluded him from exercising his volition to refuse to make a statement, or which compelled him to make a statement, then you must find a failure to comply with Article 31 in the first instance, or find that the statement was involuntarily given in the other instances. In any of these events, you must give no weight to the statement given by the accused. Also, if you find that the accused was not mentally competent at the time he made the statement, then you must give no weight to the statement."* [Emphasis supplied.]

It is clear that the foregoing advice shifted the burden of proving that he suffered from a mental disease at the time of his interrogation to the accused, for it required the court-martial affirmatively to find the existence of a mental disease, which rendered him either unable to understand the warning, or deprived him of the ability voluntarily to refrain from making a statement. The proper rule, of course, is that the court members must have found the opposite condition before they were entitled to consider the statement, *i.e.*, that accused was *not* suffering from a mental disease which made the warning meaningless to him or deprived him of volition. Manual for Courts-Martial, United States, 1951, paragraph 140a.

In United States v Monge, 1 USCMA 95, 2 CMR 1, this Court early pointed out that the United States has the burden of establishing the voluntariness of a confession it seeks to have considered. In that case, the Chief Judge pointed out, for a unanimous Court, at page 98:

"To effectuate these policies [regarding the strong possibility that confessions might have been unlawfully obtained], there exists the rule that the burden is on the prosecution to prove the voluntary nature of any confession offered in evidence."

This injunction was repeated without dissent in United States v Webb, 1 USCMA 219, 2 CMR 125, at page 221:

"It is elementary law that a confession or admission may not be received in evidence if it was not volun-

tarily made. It is also a recognized principle of military practice that a confession is not admissible in evidence before a court-martial unless it is affirmatively shown that it is voluntary."

It is equally clear that the Government has the burden of proving that accused possessed the capacity to understand a warning under the provisions of Code, supra, Article 31, and to exercise his rights thereunder. United States v Hernandez, 4 USCMA 465, 16 CMR 39; United States v Dison, 8 USCMA 616, 25 CMR 120. Turning to the precise wording of the instruction here in question, the cases are legion that such advice has the effect of shifting to the accused the responsibility for proving incapacity.

In United States v Burns, 2 USCMA 400, 9 CMR 30, the accused's mental responsibility was placed in issue. The law officer instructed the court members that he must be acquitted, " 'If in their own minds or a sufficient number of minds, *they find the accused is insane.*' " (Emphasis supplied.) Concluding that the instructions were altogether confusing and misleading, this Court remarked, at page 402:

". . . The test announced by the law officer could readily be misinterpreted to the detriment of the accused. The court-martial was told that if a certain number found the accused insane he could not be found guilty. *But no mention is made of the burden and degree of proof. The court-martial could have concluded the accused must establish his insanity to their satisfaction. Moreover, they could have assumed that he must establish it by a greater degree of proof than is necessary. The only duty we know which is imposed on the accused is that he produce sufficient evidence of insanity to place it in issue. If he does this, then the Government must prove sanity* . . . [beyond a reasonable doubt.]" [Emphasis supplied.]

In United States v Morphis, 7 USCMA 748, 23 CMR 212, the law officer advised the court-martial that they must find beyond a reasonable doubt

that accused was intoxicated before the effect of his drunkenness upon the element of premeditation in a murder charge could be considered. Over Judge Latimer's dissent, we said, at page 755:

". . . The law officer's instruction was clearly erroneous because it required the accused to assume the burden of proof beyond a reasonable doubt in order to prevail."

To the same effect, see United States v Noe, 7 USCMA 408, 22 CMR 198 ("*if you believe from the evidence beyond a reasonable doubt* that the accused was laboring under an honest mistake' "), and United States v Soccio, 8 USCMA 477, 24 CMR 287 (intent to desert might be inferred from length of absence without leave " 'in the absence of satisfactory explanation' ").

The foregoing authorities make unavoidable the conclusion that the military judge in this case shifted the burden of proof from the United States to the accused when he required lack of understanding and volitional capacity to be found before the confession need be disregarded. Prejudice is clearly demonstrated, for the court members were permitted to use in evidence a confession of the accused for all purposes, including its bearing on the principal issue of sanity, without first being required to determine that it was voluntary. In short, they were deprived of correct judicial guidance where it was essential that they receive it. United States v Noe, supra, at page 411.

The principal opinion agrees that the instruction is erroneous but adopts the Government's argument that the law officer's advice, as a whole, properly informed the court members that the burden was on the prosecution to establish that accused possessed mental capacity to understand his rights and make an informed choice whether to speak or to remain silent. This is premised on the foundation that the law officer elsewhere repeatedly so informed the court. With this reasoning, I cannot agree.

In the first place, our decision in United States v Sanchez, 11 USCMA 216, 29 CMR 32, and United States v Smith, 11 USCMA 321, 29 CMR 137, do not support the proposition that instructions on the burden of proof of sanity or guilt suffice to overcome an erroneous shifting of the responsibility of establishing involuntariness to the accused. In *Sanchez,* supra, the question involved was whether voluntariness of a confession must be established beyond a reasonable doubt. A majority of the Court held that the law officer's advice *with respect to that topic* was, as a whole, not erroneous and emphasized that it *expressly* placed the burden of proof of voluntariness upon the Government and required rejection of the confession unless it was determined to have been properly obtained. In *Smith,* supra, the instruction in question dealt only with the requirement that accused know whether a false pretense was, in fact, false, and in no respect indicated which party had the burden of proving such falsity. Indeed, a portion of the discussion of the instruction in that opinion is most illuminating when applied to the advice now before us. Thus, it was there stated, at page 326:

"Support for the contention that the challenged instruction shifts the burden of proof is sought in Boatright v United States, 105 F 2d 737 (CA 8th Cir) (1939). There the trial judge told the jury that: 'if you should find and believe from the evidence . . . that these defendants did not devise an artifice or scheme to defraud; . . . then it would be your duty to find either one or both of them not guilty.' That instruction *called for an affirmative finding that the defendants did not make the representations charged as a condition for acquittal.* In the instant instruction, there is no indication whatever the court had to find affirmatively the accused entertained an honest belief that the fact he represented was true, as a condition for acquittal."

Secondly, the law officer's conclusion of his instructions on voluntariness, given when the statement was first admitted, with a reference to his later advice on mental responsibility in general, obviously has no bearing on the propriety of his requirement that the

**539**

court find involuntariness before rejecting accused's confession. I have no doubt it was intended to serve as no more than a connecting device to insure that the court members were aware of the proper definition of mental capacity and responsibility, but, in reality, it serves to accentuate the shifting of the burden rather than to cure it. In the instructions on voluntariness, the court was told it must find accused mentally incapable before rejecting the confession. In those regarding sanity, it was told that it must affirmatively find him responsible or acquit. The second instruction thus emphasized the different rules to be applied in the two areas and, if anything, compounded the error. Moreover, this injunction was not repeated in the final instructions. At best, all that can be said is that the court was at one place told the burden was on the Government to establish sanity and, at another, that it must find involuntariness to reject accused's confession. These inconsistent standards leave no room for application of the "four corners" doctrine. United States v Noe, supra; United States v Morphis, supra. Thus, I am unable to join with the Chief Judge in reasoning that the instructions as a whole set forth a proper advice.

In sum, then, I am of the view that the law officer's instruction prejudicially and erroneously shifted the burden of proof to the accused in connection with establishing the conditions under which his confession was obtained. The error was not cured by the other instructions in the case, and I would not, in view of the seriousness of the charge, sentence, and omission, invoke the doctrine of waiver.

I would reverse the decision of the board of review and authorize a rehearing.