UNITED STATES, Appellee

v

MARVIN E. WHITE, TraDevMan Airman, U. S. Navy, Appellant

14 USCMA 646, 34 CMR 426

*Lieutenant John Thomas Montag,* USNR, argued the cause for Appellant, Accused.

*Lieutenant Colonel Remmel H. Dudley,* USMC, argued the cause for Appellee, United States. With him on the brief was *Captain James A. Potter, USN.*

## Opinion of the Court

FERGUSON, Judge:

Arraigned and tried before a general court-martial convened at Naval Air Station, Pensacola, Florida, the accused was found guilty of absence without leave, sodomy, committing a lewd and lascivious act upon the body of a minor, and false swearing, in violation of Uniform Code of Military Justice, Articles 86, 125, and 134, 10 USC §§ 886, 925, 934, respectively. He was sentenced to bad-conduct discharge, forfeiture of all pay and allowances, confinement at hard labor for one year, and reduction to the lowest grade. The convening authority set aside that portion of the sentence adjudging confinement, but otherwise approved, directing that the forfeitures "apply to pay becoming due on and after the date of this action." The board of review affirmed, and we granted accused's petition for review upon issues concerning the admissibility of a pretrial statement, the instructions of the law officer on the offense of false swearing, and the propriety of the direction by the convening authority that total forfeitures be imposed upon the accused despite his disapproval of all confinement.

I

Basically, the evidence establishes the accused, then stationed at Whiting Field, Florida, resided off-post at 51 Church Street, Bagdad, Florida. White shared his house with a fellow sailor, one McFaden, from the latter part of July 1962 until about the end of the year,

when McFaden moved elsewhere. During this period, accused engaged in acts of sodomy with McFaden on four occasions. Subsequent to his moving, McFaden was convicted of sodomy with one Ladner in the civil courts of Pensacola, Florida. Following this occurrence in January 1963, he was recommended for administrative separation from the Navy and was still awaiting such action at the time he testified in accused's trial.

In early December 1962, the accused invited a fourteen-year-old boy to spend the night with him. During the late hours of the evening in question, according to the youth's testimony, he committed the lewd acts alleged.

On April 1, 1963, accused absented himself without leave. He was apprehended by civil authorities in White Water, Wisconsin, on May 14, 1963.

On January 18, 1963, accused, after proper warning under Code, supra, Article 31, 10 USC § 831, was interrogated by Mr. Fairley, an agent of the Office of Naval Intelligence, concerning his alleged sodomies with McFaden and the lewd and lascivious acts with the young boy. Accused executed a written sworn statement in which he denied any indecent behavior or homosexual acts with either person. According to Fairley, accused expressly acknowledged his understanding of Code, supra, Article 31, and also signed a written statement to that effect. The interview occurred in the presence of Chief Bongiovanni.

On January 21, 1963, Fairley again questioned accused after properly advising him of his rights. On this occasion, accused was interviewed for approximately two hours and made an oral statement, the nature of which is not disclosed by the record. Chief Bongiovanni was again present.

On January 24, 1963, accused came under suspicion as a person who might have removed certain papers pertaining to his case from the Whiting Field Legal Office. At the instance of the Legal Officer, he was called to the Security Department and, with his consent, searched by Chief House, who was aware of the nature of the allegations against him. Upon completion of the search, accused was free to depart but, instead, asked House if he could sit down. Accused volunteered that he wished to make a statement concerning the matters of which he now stands convicted. House immediately advised accused of his rights under Code, supra, Article 31, made no promises to him, offered him no inducements, and, in fact, had not requested any statement from him. With White's consent, House called in Bongiovanni and, in their presence, accused orally confessed his guilt. After accused had done so, Chief Bongiovanni attempted telephonically to contact Mr. Fairley, in order that he might be present during the reduction of the oral statement to writing. He was informed that Fairley was "out of town." Bongiovanni decided to proceed in Fairley's absence and was "typing the statement" when the agent called and said he would be there in approximately one hour. Bongiovanni then "stopped all proceedings of the statement I was typing out right there."

When Fairley arrived, he also fully advised the accused of his rights under Code, supra, Article 31, apprising him of the fact that any statement he made might be used against him in a trial by court-martial. Accused then executed a form signifying that he was aware of his rights. Accused inquired "what would happen if a person did admit to those things." Fairley "told him that there were a few things that usually took place, one of which was

that the Commanding Officer could drop the matter, that I had nothing to do with it insofar as the disposition of his case, that his Commanding Officer could drop the matter entirely, that if he furnished a written statement, or someone furnished a written statement, they could be, in fact, processed administratively, or if they did not give a written statement, they could not be processed administratively and that a court-martial was the alternative."

The agent at no time informed the accused that he would be given an administrative discharge or that he would not be court-martialed if he made a statement. White was specifically informed that any statement made by him might be used against him in a trial by court-martial. Throughout the proceedings, accused appeared depressed or ashamed and "in a hurry to get it over with." He completed the written statement, took approximately five minutes to read it over, and signed it.

Accused's version of his interview on January 24th is somewhat different:

"Q. White, the prosecution has indicated that there would be a purported confession involved in this case, and I would like to have you explain roughly why you confessed, if in fact, you did.

"A. The reason that I made the statement to the effect that I had done anything connected with this was the fact that after McFadden [sic] was returned from Whiting Field to the Hospital, I went to see him and I asked him what he. was getting out of the whole deal, he said that he was getting, simply getting a discharge, and being released from the Navy. I saw that, then that I had done no more than he had done allegedly or vice versa so therefore I decided that I would do the same thing that he had, and should by all means get the same results he got, nothing more than a discharge.

• • • • • •

"Q. . . . Did Mr. Fairley indicate to you, that you would prob-

ably be administratively discharged if you were to confess to these acts?

"A. Into an effect he did, I could elect one of two routes taken, the first being that I could be discharged from the service, the second being, that if the Captain so chooses he could just merely drop the charges against me, that was all that was said.

"Q. In other words when you asked Mr. Fairley what you could get out of this if you did confess, he indicated only that the Captain, or your commanding officer could forget the whole matter or that you would be administratively discharged, is that correct?

"A. That is true.

"Q. Did he, at any time, indicate the fact that you would get a General Court-Martial?

"A. No, he didn't."

White conceded he had been appropriately warned under Code, supra, Article 31, that he was offered no "specific rewards," but denied that he had indicated he desired to make any statement "until I was thoroughly interrogated." However, prior to Mr. Fairley's arrival, he had made an oral statement, which had been partially reduced to writing. White declared that "we had not gotten into any confession when it was dropped." Fairley's comments were made in response to White's inquiry as to "what the results would be." Fairley gave him the impression he would be administratively discharged when he signed his confession.

The law officer admitted the accused's written statement into evidence and submitted the issue of its voluntary nature to the court members under carefully tailored instructions. These informed the court there was evidence before it which indicated accused was told he must make a confession or statement before he could obtain an administrative discharge and if such was the effective cause of his execution of the confession, unlawful influence or unlawful inducement would be present. The law officer then advised the court that, unless it found accused "did not make

650

the statement . . . in reliance upon a promise or misrepresentation . . . you must refuse to consider Prosecution Exhibit 4 and you must reject it as evidence in the case." The instructions also properly placed the burden of proving voluntariness beyond a reasonable doubt upon the prosecution and informed the court the statement might be accepted by it as proof only if it was satisfied that such burden had been met.

## II

The question before us does not involve the sufficiency of these eminently satisfactory instructions. The contention of the accused is that the state of the record is such as to establish the involuntariness of his statement as a matter of law and that the question is not one which should have been submitted to the fact finders. He bases his position on declarations in the record which are said to establish he was unlawfully induced to confess by being informed "if he furnished a written statement he could be processed out of the Navy administratively, but if he did not give a written statement, he could not be processed administratively and a court-martial would be the alternative." This argument views the circumstances surrounding the procurement of accused's statement too narrowly.

Concededly, a substantial issue of voluntariness may be raised by introduction into the interview of an accused or suspect of the possibility of obtaining an administrative separation from the service in return for his admission of guilt. In United States v Tanner, 14 USCMA 447, 34 CMR 227, we held a similar contention to raise a strong question concerning the admissibility of a confession, requiring it to be submitted to the fact finders under appropriate instructions. There, we declared, at page 450:

"There can be no doubt that the testimony of Sergeant Grimes and the accused raises a grave issue concerning the voluntariness of the latter's confession. If the evidence favorable to Tanner was to be credited by the

fact finders, it would appear that Grimes, after long questioning of the accused, rendered .fruitless by the interposition of legal advice, obtained the statement and disclosure of the tools' location by bluntly threatening him with severe punishment at the hands of the civil authorities if he did not confess, as opposed to promising avoidance of prosecution altogether if he did cooperate. As to the last mentioned alternative, we note that the record discloses accused's administrative separation from the service was pending at the time of the interrogation, and even Grimes' testimony concerning the discussion of allowing such procedures to be carried out in lieu of prosecuting Airman Barnhill leaves little doubt that he hoped thereby 'to get him to talk.' Indeed, we have been made aware that such administrative procedures have been used in order to avoid trial under the Uniform Code. Cf. concurring opinion of Chief Judge Quinn, United States v Phipps, 12 USCMA 14, 30 CMR 14."

But the accused's testimony that he was induced to confess by Agent Fairley's comments is not the only version of the interrogation present in this record. Indeed, White himself initially declared he made the statement after finding out McFaden was receiving an administrative discharge and determining "I would do the same thing that he had, and should by all means get the same results he got, nothing more than a discharge." Quite without regard to the defects in accused's own version, however, it appears from the testimony of House and Bongiovanni that accused was brought to their office on another matter and, after being told he was free to leave, asked permission to remain. Thereafter, he volunteered to House that he wished to make a statement concerning the allegations against him and, in fact, did so orally in the presence of Bongiovanni. According to the transcript, it was only after this oral statement had been made that any attempt to contact Fairley ensued. When he could not be found, House and Bongiovanni, without objection on the part of the accused, commenced re-

duction of the oral statement to writing. Again, it is only accused's version which declares that they had not proceeded to "any confession when it was dropped." The testimony of the investigators is to the contrary. Moreover, according to Fairley, it was after this that accused made inquiry concerning the possible courses of action open against a person who admitted his guilt of such behavior. Fairley declared he did no more than indicate the courses of action open to accused's commanding officer, specifically informing him that he personally had nothing to do with the disposition of the case.

Thus, under the evidence in this record, it was open to the court members to decide that accused made his statements, oral and written, not because of anything which Fairley might have said to him, but because of his earlier conversation with McFaden and that he had, in fact, implemented his decision voluntarily at the time that Fairley arrived on the scene. Cf. United States v Powell, 13 USCMA 364, 32 CMR 364; United States v Caliendo, 13 USCMA 405, 32 CMR 405. Here, as in *Caliendo*, supra, "there is conflicting evidence," and the law officer, as was his duty, submitted the differing versions of the circumstances to the court-martial under proper instructions. And as we early declared in United States v Monge, 1 USCMA 95, 2 CMR 1, at page 98:

". . . To fulfill our appellate responsibility, it is incumbent upon us to review independently the circumstances surrounding the allegedly involuntary confession. But where there is disagreement as to whether claimed improper acts actually occurred or where admitted facts permit different inferences, the trial forum is not only better equipped but has the legal duty to weigh the evidence and decide whether the confession is, in fact, voluntary. We must accept the determination of the triers of fact on the question of voluntariness whenever it is supported by substantial evidence, regardless of whether we, as individuals, might resolve the conflict otherwise, or draw

651

different inferences from the facts. If the fact finders could reasonably conclude that the confession was voluntary, then we must affirm."

The circumstances surrounding the obtaining of accused's confession on January 24, as shown on this record, left a question for the court members, and we hold that accused's confession was not inadmissible as a matter of law.

### III

The second issue before the Court concerns itself with the sufficiency of a portion of the law officer's instructions concerning the offense of false swearing. In this connection, it should be noted that the charge here involved is based upon accused's denial of homosexual conduct with McFaden and the fourteen-year-old youth, which was made under oath and in writing to Agent Fairley on January 18. The matter which gives rise to the controversy is set forth as follows:

". . . You are further advised that the falsity of the sworn statement alleged must be proved by one of the following means: first, by the testimony of two witnesses bearing directly on the alleged falsity or secondly, by the testimony of at least one witness bearing directly on the alleged falsity with corroboration by other testimony or by circumstantial evidence tending to prove such falsity and—rather or, the third means, by documentary evidence directly disproving the truth of the allegedly falsely sworn statement; however, such documentary evidence must be corroborated by testimony or by circumstances tending the [sic] prove the falsity of the allegedly falsely sworn statement unless the document is an official record shown to have been well known to the accused at the time he took the oath or unless it appears that the documentary evidence was in existence before the allegedly false statment [sic] was made and that such evidence sprang from the accused himself or was in any manner recognized by him as containing the truth. In such a case it may be inferred that the accused should not—did not believe the allegedly falsely sworn statement to be true.

"DC: Could you repeat 'falsity' again please, sir?

"LO: I will be glad to. Members of the court are advised that in the offense of false swearing, the falsity of the sworn statement alleged must be proved by one of the following means: First, by the testimony of two witnesses bearing directly on the alleged falsity. In other words, gentlemen, in explanation or amplification of category number one, the testimony of one person and nothing else would be legally insufficient. There must be at least two witnesses in the offense of false swearing who must testify bearing directly on the alleged falsity. However, the second means is as follows: By the testimony of at least one witness bearing directly on the alleged falsity with corroboration by other testimony or by circumstantial evidence tending to prove such falsity. And thirdly, and in this third category, there are some matters that are inapplicable in this particular case since there does not appear to be a factual situation indicated in the existence of documentary evidence before the allegedly false statement was made; however, I will read the entire third category which is as follows: By documentary evidence directly disproving the truth of the allegedly falsely sworn statement. However, the—such documentary evidence must be corroborated by testimony or by circumstances tending to prove the falsity of the allegedly falsely sworn statement unless the document is an official record shown to have been well known to the accused at the time he took the oath or unless it appears that the documentary evidence was in existence before the allegedly false statement was made and that such evidence sprang from the accused himself or was in any manner recognized by him as containing the truth. In such a case, it may be inferred that the accused did not believe the allegedly falsely sworn statement to be true. Incidently, you will be later

advised as to the definition of circumstantial evidence.

"PRES: I notice at the beginning of that standard of evidence it mentions the document and then it uses the word 'unless'. Now, in all cases, does it mean the documemt [sic]· cannot be considered unless it was in evidence before the false statement, the alleged false statement?

"LO: No, sir. Perhaps I will have to paraphrase at least the third category and that is, the falsity of the sworn statement allegedly made must be proved by one of the following means and in lieu of the requirement of two witnesses or more testifying, the falsity of the sworn statement may be proved by documentary evidence directly disproving the truth of the allegedly falsely sworn statement. Then there is the explanation; however, such documentary evidence must be corroborated by testimony or by circumstances tending to prove the falsity of the allegedly falsely sworn statement. Now those two sentences are to be considered together. There then is the further explanation which says 'less is required if a document is an official record.'

"PRES: Am I correct in assuming —interpreting that portion that you just explained as being possibly applicable in this case?

"LO: The Law Officer, of course, cannot indicate his opinion as to the weight to be attached to any particular evidence or the credibility to be given to any particular witness. It becomes dangerous for the Law Officer to comment on the evidence to the extent that he believes that this particular thing is directly applicable. You must, of course,—

"PRES: I used the word 'possibly' applicable?

"LO: That is true and the Law Officer can go that far."

The accused vigorously contends that the instructions were so confused through reference to proof of false swearing by means of documentary evidence that they became incomprehensible and offered no meaningful guide to the court members concerning the proper methods of determining accused's guilt or innocence. On the other hand, the Government argues that the questionable portion of the advice was unnecessary and inapplicable and could not have prejudiced accused as "there was no question that the facts in evidence did not permit the application of the rule given in the instruction."

Instructions which have no bearing on the issues before the court-martial may be prejudicial, and we so noted in United States v Duckworth, 13 USCMA 515, 33 CMR 47. See also United States v Jones, 13 USCMA 635, 33 CMR 167; and United States v Roberson, 12 USCMA 719, 31 CMR 305. The duty of the law officer of a general court-martial, or the president of a special court-martial, is, as we have so often stated, affirmatively to submit "the respective theories, both of the Government and of the accused on trial, to the triers of fact, with lucid guideposts, to the end that they may knowledgeably apply the law to the facts as they find them." United States v Smith, 13 USCMA 471, 474, 33 CMR 3, 6.

Here, the law officer injected into the case a method of proving false swearing which had no applicability to the evidence before the court-martial or the theory upon which the United States was proceeding. While, on one occasion, he indicated that such might not apply to the situation depicted in this court-martial, he later conceded, in response to inquiry by the president, there was a possibility it was relevant to the court's task. Under its terms, the necessity of corroboration of testimony by McFaden and the youth was eliminated if accused's false sworn statement was found to be contrary to a document constituting "an official record shown to have been well known to the accused at the time he took the oath or unless it appears that the documentary evidence was in existence before the allegedly false statement was made and that such evidence sprang from the accused himself or was in any manner recognized by him as containing the truth." The president's immediate in-

quiry concerning the use of the word "unless" denoted his complete misunderstanding of the concept involved and his apparent belief that the "documemt [sic] cannot be considered unless it was in evidence before the false statement." In attempting to eliminate this impression, the law officer then went on to explain that falsity might be proven either by the use of two witnesses or by corroborated documentary evidence, but that " 'less is required if a document is an official record'." He then conceded, as noted above, that the latter statement was "possibly" applicable to the case then under consideration.

In United States v Sanders, 14 USCMA 524, 34 CMR 304, we reversed on the basis of a law officer's similarly confused attempt to explain a legal concept not applicable to the situation presented to the court members in that case. There, we declared, at page 531:

> "Taken as a whole, we believe the above instructions to be sufficiently confusing to at least raise a doubt as to whether the court properly understood and utilized the correct standard on this issue. And where there is room for reasonable doubt, such doubt must be resolved in favor of the accused. United States v McIntosh, 12 USCMA 474, 31 CMR 60; United States v Lombardi, 14 USCMA 466, 34 CMR 246."

The same conclusion must be reached here. Considering the instructions together with the inquiries made by the president, there is a fair risk the court members were led to believe that less or no corroboration was required in order to find accused guilty, in view of the nature of his sworn statements to the Office of Naval Intelligence. It takes little imagination to glean from the instructions and discussion that the court may have considered accused's ultimate written confession to be an "official record" in the case and, consequently, to treat it as such in judging the falsity of his statement of January 18. Under these circumstances, we find that the instructions were prejudicially erroneous. The findings of guilty of

**654**

specification 2 of Charge II must be set aside.

## IV

The final issue before us deals with the efficacy of the convening authority's action in providing for the immediate application of the adjudged total forfeitures although no confinement was approved therein. As to this issue, the accused argues it is illegal for an accused to be required to remain in the service and on a duty status without being entitled to draw either pay or allowances. Cf. United States v Watkins, 2 USCMA 287, 8 CMR 87; United States v Trawick, 10 USCMA 80, 27 CMR 154. In addition, relying upon a statement in United States v Jobe, 10 USCMA 276, 27 CMR 350, he urges that imposition of total forfeitures upon the accused under such conditions might constitute cruel and unusual punishment in violation of Code, supra, Article 55, 10 USC § 855. In rebuttal, the Government points out that the convening authority's action in imposing forfeitures was coupled with granting him leave without pay pending completion of appellate review and execution of his punitive discharge. Such action, declares the Government, was in the best interests of the Navy and the accused, was legal, and should not be set aside.

The barrier to ordering application of forfeitures to pay and allowances becoming due on and after the date of the convening authority's action lies in Code, supra, Article 57, 10 USC § 857, which provides:

> "(a) Whenever a sentence of a court-martial as lawfully adjudged and approved includes a forfeiture of pay or allowances *in addition to confinement not suspended*, the forfeiture may apply to pay or allowances becoming due on or after the date the sentence is approved by the convening authority. No forfeiture may extend to any pay or allowances accrued before that date.
>
> • • • • • •
>
> "(c) All other sentences of courts-martial are effective on the date ordered executed." [Emphasis supplied.]

In United States v. Watkins, supra, the Court pointed out that Article 57 must be read in connection with Code, supra, Article 71, which concerns itself with the execution of court-martial sentences, and declared, at page 291:

". . . When that is done the various portions of a sentence become effective in the following order: (a) that portion of the sentence ordering confinement is effective on the date sentence is imposed by the court-martial; (b) if in addition to confinement, unsuspended, a sentence includes forfeitures, it may become effective on the date the convening authority approves; (c) *if confinement is not included, forfeitures may become effective on the date the convening authority orders them into execution;* (d) punitive discharges may not be effective until the appellate processes have been completed; and (e) the sentences of death, dismissal from the service, or those affecting a general or flag officer may not be effective until approved by the appropriate executive." [Emphasis supplied.]

Where, as in this case, the sentence includes an unsuspended punitive discharge, it may not be ordered into execution until "affirmed by a board of review and, in cases reviewed by it, the Court of Military Appeals." Code, supra, Article 71, 10 USC § 871. Hence, the forfeiture of all pay and allowances adjudged and approved in this case could not be ordered executed by the convening or other authority until completion of our review, and, as noted in United States v Watkins, supra, as no confinement was approved in his action, the application of such forfeitures must be deferred until promulgation of his final order of execution. See also United States v Trawick, supra. Accordingly, that portion of the convening authority's action which directed the application of the adjudged forfeitures immediately is in violation of Code, supra, Article 57, and must be set aside. It is so ordered.

The findings of guilty of specification 2, Charge II, are set aside, and the action of the convening authority is modified to provide for deferment of the application of the adjudged and approved forfeitures until the date of promulgation of the final order directing execution of the sentence. The record of trial is returned to the board of review, which may reassess the sentence on the basis of the remaining findings of guilty.

Chief Judge QUINN and Judge KILDAY concur.