## UNITED STATES

v.

Private First Class (E–3) Gene F. MICHAUD, 458–84–7393, U.S. Army, 526th Military Police Company, 14th Military Police Group, Fort George G. Meade, Maryland.

CM 430328.

U. S. Army Court of Military Review.

Sentence Adjudged 28 Sept. 1972.

Decided 20 Nov. 1975.

Appearances: Appellate counsel for the Accused: CPT John M. Nolan, JAGC; CPT Ronald Lewis Gallant, JAGC; CPT T. Barry Kingham, JAGC; CPT Allan K. DuBois, JAGC; MAJ Richard J. Goddard, JAGC; LTC Edward S. Adamkewicz, Jr, JAGC; COL Arnold I. Melnick, JAGC; COL Victor A. De Fiori, JAGC. Appellate counsel for the United States: CPT Robert P. Terzian, JAGC; CPT Gary F. Thorne, JAGC; LTC Donald W. Hansen, JAGC; LTC Ronald M. Holdaway, JAGC.

## OPINION OF THE COURT

COOK, Judge:

The appellant was tried by general court-martial for a violation of Article 118, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 918 (premeditated murder) but was found guilty of a violation of Article 119, UCMJ, 10 U.S.C. § 919 (voluntary manslaughter). He was sentenced as noted above.

On Friday, 17 December 1971, appellant returned to his quarters at approximately 1700 hours and found his wife's dead body. She had sustained eight stab wounds in her neck, chest and abdomen. There were also some deep cuts on her right hand and wrist, apparently inflicted when she tried to ward off her attacker. Additionally, her body contained seven nick marks and a pronounced bruise on the left arm made by a bite. Testimony established that death occurred sometime between 1430 and 1600 hours, 17 December 1971.

Appellant reported his find to the neighbors who summoned the authorities. Appellant was removed to the local CID office for an interview. At this time there was no particular suspicion of the appellant and he was treated as a bereaved husband. During this interview he made a completely exculpatory statement. However, while at the CID office the appellant's actions were less than totally rational. The appellant was accompanied by the family dog, and on several occasions he addressed the animal as "baby" or "son." At one point the dog left appellant's sight and appellant became extremely agitated, leaping up from his seat and inquiring "Where did my son go?" Appellant also talked to the dog concerning Mrs. Michaud's death. On several occasions relating to the animal that "Mommy's gone" and on another occasion he told the dog not to worry because "Mommy's coming home." Although appellant had seen his wife's obviously mutilated body at the scene, he inquired of an agent at the CID office if she was dead. Further, although he displayed some emotional disturbance at the discovery site, he displayed no such agitation or grief during the ensuing three-hour interview period.

On Saturday, 18 December 1971, he was again at the CID office, and, although he contributed nothing of significance to the progress of the investigation, he did relate to the agents that he had been awakened that morning by his wife kissing him.

On Sunday, 19 December 1971, he spent some time in the presence of a CID agent during which he stated in a serious way that he was a warlock and that his mother and his wife were witches, and that his mother was taking over his mind. Further, he claimed he possessed ESP.

On Monday, 20 December 1971, the deceased woman's relatives arrived at post and appellant had a meeting with them. Later that day, after being advised of his rights, appellant consented, and submitted, to the taking of a dental mold.

On Tuesday, 21 December 1971, the two principal investigators decided to alter their approach to the appellant. They felt that they had reason to believe that he was a more likely suspect than they had originally assumed, and they decided to treat him accordingly. Therefore, after advising him of his rights, they took an accusatory posture with him. For about an hour and a half appellant persisted in his prior denial while the agents, asserting incorrectly that the bite mark had been identified as his, refused to accept appellant's exculpatory version of his activities on the date of the death. Finally, at about 1230 hours appellant related that he could see himself at the door of his apartment. This statement was followed, after about a 45 minute lunch break, with another oral observation that he, appellant, could recall seeing his wife with her blouse open (Mrs. Michaud's body was found fully clothed except that her blouse was on over only one arm) and then they got into a fight, a scuffle. Throughout this percontation the appellant repeatedly inquired of his interrogators as to when during the day of the murder he could have done this killing.

Finally, at approximately 1900 hours that evening, after a visit to the murder scene,

the agents reduced to a statement form what they had gleaned from their interrogation of the appellant. Although in the main, the statement is inculpatory, it is replete with equivocal and modifying phrases, e. g., ". . . I don't know if I stabbed her or not," ". . . I don't even remember going home." "If I stabbed her, I did not know what I was doing," "I don't know if I did or if it is just a dream." The appellant's signature on the statement, when compared to another known exemplar, is obviously scribbled and erratic. Additionally, after the statement was prepared but before appellant signed it, he balked at signing it asserting that when the true killer was found he, appellant would be subject to prosecution for making a false statement. Only after one of the agents allayed his fears in this particular did appellant finally sign, at 2100 hours, the incriminatory statement admitted at trial as Prosecution Exhibit 1. Shortly after signing the statement, appellant asked if he had hurt his chances of becoming a CID agent. The next morning an agent was summoned to the stockade at the behest of appellant whereupon he immediately repudiated the statement. At trial this statement was admitted as Prosecution Exhibit 1.

On appeal, as at trial, appellant defends against the admissibility of his statement on the basis that he did not, at the time he made the statement, possess the requisite mental capacity to freely elect to speak or remain silent. Appellant concedes that he was provided all the required warnings and advice, nonetheless, he asserts, due to his mental condition at the time in question he was unable to make a knowing, conscious and intelligent waiver of those rights.

In order to substantiate this assertion, the appellant initially presented Doctor Terry Gagon, the chief resident of the Psychiatric Department, Walter Reed Medical Center. As a result of Doctor Gagon's testimony, the trial judge became concerned about the defendant's mental condition and directed that a sanity board hearing be conducted in accordance with the provisions of paragraph 121, Manual for Courts-Martial, United States, 1969 (Revised edition).

Consequently, a board was convened. Thereafter, Doctor Gagon, who was one of the three psychiatrists appointed to the board, testified on the appellant's mental condition as found by the board. Additionally, Doctor John Follonsbee, Chief of the Psychiatric Clinic, Department of Psychiatry, Walter Reed, who was the president of the board, also testified as to the board's unanimous findings.

In the instructions to the sanity board, it was directed not only to respond to the standard three questions concerning an accused's freedom from mental defect, disease, or derangement at the time of the crime and his present ability to stand trial, but four other queries as well.

Those questions were:

"1. Can it reasonably be determined by psychiatric examination and evaluation whether the accused on 20 and 21 December 1971 possessed the mental capacity to knowingly, consciously, and understandingly confess or deny participation in the crime he is alleged to have committed?

2. If so, did the accused on 20 and 21 December 1971 possess the mental capacity to knowingly, consciously and understandingly confess or deny participation in the crime he is alleged to have committed?

3. Can it reasonably be determined by psychiatric examination and evaluation whether the accused on 20 and 21 December 1971 possessed the mental capacity to understand explained rights to counsel and to make a knowing and conscious determination whether to request or not request the assistance of counsel?

4. If so, did the accused on 20 and 21 December 1971 possess the mental capacity to understand explained rights to counsel and to make a knowing and conscious determination whether to request or not request the assistance of counsel?"

It was the unanimous opinion of that board that the answer to the first and third quoted questions was "yes" while its united response to the crucial second and fourth queries was "no."

The sanity board bottomed its opinion on a medical and psychiatric work-up that began on 23 March 1972 and continued intermittently through early August 1972. This work-up consisted of 12 hours of psychological testing by personnel of the Psychological Department at Walter Reed. Additionally, the defendant was subjected to laboratory examinations which included a skull x-ray, a brain scan, an electro-encephalogram, as well as a neurological and physical examination. Appellant was also interviewed by the three psychiatrists, separately and as a group for a total of approximately 13 hours. Each one separately diagnosed the appellant as schizophrenic, chronic, undifferentiated in type with some paranoid features. And collectively they arrived at, and unanimously agreed that there was a "serious doubt as to this individual's capacity (on 20 and 21 December 1971) to knowingly, consciously and understandably confess or deny participation in the crime he is alleged to have committed," and "that he did not possess sufficient mental capacity to understand (on 20 and 21 December 1971) explained rights to counsel and to make a knowing and conscious determination whether to request or not to request the assistance of counsel." It appears from the testimony of the board members that although someone with appellant's condition could live what would appear to be a normal life, his mental disorder would severely interfere with his thought processes when he is subjected to strong emotional stress. The board psychiatrists found the sources of such stress on 21 December to be the death of appellant's wife, the visit to the death site, the meeting with his in-laws (whereat he was asked by them if he had murdered his wife) and the change in interrogation tactics. These same psychiatrists found that not only did his deranged condition preclude appellant from fully appreciating the options provided by the required warnings, but they also found that his mental disorder left appellant highly suggestible to accepting or believing anything he was told. Further, their examination revealed that appellant had a pathological tendency to identify with his adversaries and to cooperate with them. And that appellant would, when asked a question, provide a response, any response, even if he knew it was wrong.

To counterbalance this evidence the prosecution presented Doctor Jeffrey Hammer, an Army psychiatrist stationed at Fort Meade, Maryland, who interviewed the appellant on 23 December 1971. Doctor Hammer's examination of the defendant lasted for 40 to 50 minutes. He stated that the sole purpose of his evaluation was to determine appellant's competency to stand trial, and he specifically refused to discuss with appellant anything about his confession. Nevertheless, Doctor Hammer testified that in his opinion the defendant was not schizophrenic and was capable of understanding the Article 31, UCMJ, 10 U.S.C. § 831, warning and of making a voluntary, willing and knowing confession. The prosecution also presented lay testimony consisting of the observed conduct of appellant.

The genesis and landmark case on the law concerning confessions, as it applies to courts-martial conducted under the UCMJ, is *United States v. Monge,* 1 U.S.C.M.A. 95, 2 C.M.R. 1 (1952). In examining the basic law on the subject the United States Court of Military Appeals noted that: ". . . the very weight given to confessions as evidence of guilt has caused the courts to subject them to careful scrutiny, receiving them with great caution."[1] Consequently, the court stated, ". . . [T]he burden is on the prosecution to prove the voluntary nature of any confession offered in evidence. The issue of voluntariness, as presented to the trial court is usually one of fact. Basically, the question is whether the accused possessed, at the time of the confession, 'mental freedom' to confess or deny participation in the crime."[2]

Two years after the *Monge* decision the United States Court of Military Appeals

---

1. *United States v. Monge,* 1 U.S.C.M.A. 95, 97, 2 C.M.R. 1, 3 (1952).

2. *Id.* at 98, 2 C.M.R. at 4.

decided *United States v. Josey,* 3 U.S.C. M.A. 767, 14 C.M.R. 185 (1954), wherein it stated at page 782 that: ". . . [T]wo conditions to its (a confession) admissibility exist: (1) the presence of preliminary proof that it was made voluntarily, (2) an affirmative showing that the accused had been warned of his right to remain silent, as granted by Article 31 of the Code. . ." [3] And the court reaffirmed the standard concerning voluntariness that it had earlier established in *Monge* when it stated: "We believe the test as to voluntariness to be applied is whether the accused was deprived of his mental freedom to speak or to stand mute." [4]

In the same year that the United States Court of Military Appeals decided the *Josey* case the court also had occasion to enunciate some guidance concerning the second condition mentioned in the quote, *supra,* from that case, *i. e.,* prior Article 31 warning. The court was to make what should have been obvious patently clear by stating that the interrogatee must comprehend the contents of the mandatory recitation of Article 31. The particular case in this regard was *United States v. Hernandez,* 4 U.S.C. M.A. 465, 16 C.M.R. 39 (1954), wherein it appeared that the accused had a limited grasp of the English language and thus did not fully understand the interrogator's reading of Article 31. The court said, "We entertain no doubt this provision requires that an accused who is so advised must actually understand his rights." [5]

■ Finally, there can be no doubt at this point in our jurisprudential development that an improperly obtained statement, if admitted at trial, requires reversal regardless of other evidence of guilt.[6]

■ As already noted, the burden is on the government to prove the voluntary nature of the statement beyond a reasonable doubt. *See* paragraph 140*a,* MCM 1969 (Rev).[7] This Court must apply the same standard.[8]

■ This Court recognizes that psychiatry is an inexact science and psychiatric testimony must be closely scrutinized.[9] Further, the Court is aware that it need not slavishly subscribe to medical testimony,[10] but is free to rely on contra evidence even from lay sources.[11] Additionally, the Court is not unmindful of the salutory injunction that in performing its judicial function it must do so "recognizing that the trial court saw and heard the witnesses." Article 66(c), UCMJ, (10 U.S.C. § 866(c)).

3. Accord, *United States v. Tanner,* 14 U.S.C. M.A. 447, 34 C.M.R. 227 (1964); *United States v. White,* 14 U.S.C.M.A. 646, 34 C.M.R. 426 (1964); *United States v. Askew,* 14 U.S.C.M.A. 257, 34 C.M.R. 37 (1963); *United States v. Dalrymple,* 14 U.S.C.M.A. 307, 34 C.M.R. 87 (1963); *United States v. Gibson,* 3 U.S.C.M.A. 746, 14 C.M.R. 164 (1954).

4. *United States v. Josey, infra* at page 775.

5. *United States v. Hernandez, infra* at page 468. *Also see, United States v. Dison,* 8 U.S.C. M.A. 616, 25 C.M.R. 120 (1958), interrogatee was too intoxicated to understand warning; *United States v. Rogan,* 8 U.S.C.M.A. 739, 25 C.M.R. 243 (1958) at page 248, ". . . lacked the intelligence or the emotional stability to understand the investigating officers advice."; *United States v. Morse,* 14 U.S.C.M.A. 532, 34 C.M.R. 312 (1964); *United States v. Keller,* 17 U.S.C.M.A. 507, 38 C.M.R. 305 (1968).

6. *United States v. Josey, supra; United States v. Kaiser,* 19 U.S.C.M.A. 104, 41 C.M.R. 104 (1969); *United States v. Williams,* 8 U.S.C.M.A. 443, 24 C.M.R. 253 (1957); *United States v. Taylor,* 5 U.S.C.M.A. 178, 17 C.M.R. 178 (1954); *United States v. Trojanowski,* 5 U.S.C.M.A. 305, 17 C.M.R. 305 (1954); *United States v. Tanner, supra; United States v. Hernandez, supra.* But see *United States v. Garcia,* 38 C.M.R. 625 (A.B.R.1967).

7. *United States v. Meade,* 20 U.S.C.M.A. 510, 43 C.M.R. 350 (1971).

8. *United States v. Pettiford,* 9 U.S.C.M.A. 648, 26 C.M.R. 428 (1958); *United States v. Troutt,* 8 U.S.C.M.A. 436, 24 C.M.R. 246 (1957).

9. *United States v. Kunak,* 5 U.S.C.M.A. 346, 17 C.M.R. 346 (1954); *United States v. Biesak,* 3 U.S.C.M.A. 714, 14 C.M.R. 132 (1954).

10. *United States v. Carey,* 11 U.S.C.M.A. 443, 29 C.M.R. 259 (1960).

11. *United States v. Biesak, supra; United States v. Voigt,* 17 C.M.R. 862 (ABR 1954); paragraph 122*c,* MCM 1969 (Rev).

However, weighing the evidence of record—comparing the number of psychiatrists that arrived at an identical conclusion after a lengthy and comprehensive evaluation with the single psychiatrist's terse interview in a custodial atmosphere [12] as well as the lay opinions concerning a subtle mental aberration—leads this Court to conclude that the proof proffered by the government does not establish beyond a reasonable doubt that the appellant was able on 21 December 1971 to effectively understand the required prestatement warning.

Consequently, the alleged confession of 21 December 1971 should 'not have been admitted and reversal of this conviction is required.[13]

The findings of guilty and the sentence are set aside and a rehearing may be ordered.

Senior Judge BAILEY and Judge DeFORD concur.

UNITED STATES

---

**12.** *See United States v. Erb,* 12 U.S.C.M.A. 524 at page 535, 31 C.M.R. 110 at page 121 (1961).

**13.** *See* footnote 6, *supra,* and its accompanying text.